RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0126p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

JOSHAWA WEBB (14-3443); HERMAN PRICE (14-3444),
                              *Plaintiffs-Appellants,*

    *v.*

UNITED STATES OF AMERICA, et al.,
                              *Defendants-Appellees.*

Nos. 14-3443/3444

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
Nos. 1:07-cv-03290; 1:09-cv-00118; 1:10-cv-01673—Christopher A. Boyko, District Judge.

Argued: January 16, 2015

Decided and Filed: June 17, 2015

Before: BOGGS, SILER, and CLAY, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Jon Loevy, LOEVY & LOEVY, Chicago, Illinois, for Appellants. Daniel T. Downey, FISHEL HASS KIM ALBRECHT LLP, Columbus, Ohio, for Richland County Appellees. Thomas G. Roth, Belle Meade, New Jersey, for Appellee Lucas. Lowell V. Sturgill Jr, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. **ON BRIEF:** Jon Loevy, Debra Loevy-Reyes, LOEVY & LOEVY, Chicago, Illinois, for Appellants. Daniel T. Downey, Paul M. Bernhart, FISHEL HASS KIM ALBRECHT LLP, Columbus, Ohio, for Richland County Appellees. Thomas G. Roth, Belle Meade, New Jersey, Joel J. Kirkpatrick, Plymouth, Michigan, for Appellee Lucas. Lowell V. Sturgill Jr, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Federal Appellees. Michael M. Heimlich, Delaware, Ohio, for Appellee Metcalf. Jennifer M. Meyer, CITY OF CLEVELAND, Cleveland, Ohio, for Appellee Ansari.

1

---

**OPINION**

---

BOGGS, Circuit Judge. Plaintiffs-Appellants Joshawa Webb and Herman Price (a.k.a. Ronald Davis) appeal the district court's grants of summary judgment and dismissals of their claims in their civil-rights actions against Defendants-Appellees Drug Enforcement Agency (DEA) officers Lee Lucas, Robert Cross, Thomas Verhiley, and Jamaal Ansari; Richland County Sheriff's Office (RCSO) officers Chuck Metcalf, Matt Mayer, and Larry Faith; and the United States. The Plaintiffs argue that the district court erroneously held that: (1) Price lacked standing to sue; (2) qualified immunity shielded each of the law-enforcement Defendants from the Plaintiffs' *Bivens* and § 1983 claims for malicious prosecution, false arrest, fabrication of evidence, and conspiracy to deprive civil rights; and (3) the Plaintiffs' state-law tort claims against the individual Defendants and Federal Tort Claims Act (FTCA) claims against the United States must be dismissed.

For reasons set forth below, we reverse the district court's decision that Price lacked standing. We also reverse the grants of summary judgment to: Lucas and Metcalf with respect to Webb's malicious-prosecution claim; Lucas, Metcalf, and Faith with respect to Price's malicious-prosecution claim; Lucas with respect to Webb's false-arrest claim; Lucas, Metcalf, and Cross with respect to Webb's fabrication-of-evidence claim; Lucas, Metcalf, and Faith with respect to Price's fabrication-of-evidence claim; Lucas, Metcalf, and Cross with respect to Webb's federal conspiracy claims; and Lucas, Metcalf, and Faith with respect to Price's federal conspiracy claims. Price's false-arrest and trespass claims under the FTCA are time barred. We reverse and remand the Plaintiffs' state-law and remaining FTCA claims and affirm the remaining dismissals and grants of summary judgment.

## I. Background

### A. Operation Turnaround

Webb and Price were separately arrested and charged as part of "Operation Turnaround," a "corrupted investigation into the Mansfield, Ohio, drug trade." *Robertson v. Lucas*, 753 F.3d

606, 610 (6th Cir. 2014); *see also Brown v. United States*, 545 F. App'x 435 (6th Cir. 2013); *Mott v. Mayer*, 524 F. App'x 179 (6th Cir. 2013). The RCSO launched Operation Turnaround after discovering the body of Timothy Harris in Richland County, Ohio on December 31, 2004. *Webb v. Lucas*, No. 1:07-cv-3290, 2013 WL 1303776, at *2 (N.D. Ohio Mar. 28, 2013). His death was believed to be drug related. *Ibid.* The RCSO recruited Jerrel Bray as a confidential informant to make undercover buys of illegal drugs from suspected drug traffickers in Mansfield. *Ibid.* In August 2005, DEA Agents Lucas and Cross joined the investigation at RCSO's request and registered Bray as a DEA informant. They were assisted by DEA Task Force Officers Ansari and Verhiley. Bray's first controlled buy as a DEA informant occurred on September 6, 2005.

> Each controlled buy was supposed to proceed as follows. Bray and the RCSO officers would identify a target and inform the DEA agents, who would supply the buy money and travel from Cleveland to assist. Bray would place a phone call to the target. Investigators would search Bray and his vehicle before the buy and follow Bray to the location of the buy, attempting to view or record the transaction when possible. After the buy, they would follow Bray back to the sheriff's office, search Bray's person and vehicle, and take a statement from Bray.

*Mott*, 524 F. App'x at 181.

On the basis of Bray's controlled buys, law-enforcement officials arrested and charged over two dozen individuals with violating federal criminal drug laws. Webb and Price were among these individuals. Lucas was the case agent who testified before the grand jury that indicted Webb and Price. Following the completion of Operation Turnaround, Bray, while he was in jail for killing a man in an unrelated Cleveland drug deal, disclosed that Lucas conspired with him to frame innocent individuals—including Webb and Price.

This admission prompted the Office of Inspector General (OIG) of the United States Department of Justice to launch an investigation, which revealed that numerous Operation Turnaround targets—including Webb and Price—did not participate in the drug deals for which they were charged. Bray had used stand-ins to participate in the drug deals and then falsely identified each stand-in as an Operation Turnaround target. *Robertson*, 753 F.3d at 612. Bray later testified that Lucas *did not* conspire with him to frame targets and that he acted on his own

initiative. In any event, the OIG concluded that law-enforcement officials supported Bray's false identifications by knowingly making false reports and testimony and by covering up his misdeeds.

> For example, a stand-in was used to frame . . . Dwayne Nabors. Metcalf has admitted that he lied during Nabors's criminal trial, including admitting to a false identification of Nabors. Ansari also falsely identified Nabors in the alleged drug transaction. Lucas and Metcalf lied to the prosecutor about whether there was video taken of the transaction, although Metcalf himself had operated the video camera.
>
> Bray used the controlled buys to steal money and drugs. [Law-enforcement officers] were aware of this fact yet continued to use Bray as an informant. On one occasion, Verhiley and Ansari caught Bray stealing money given to him for a drug buy. On another occasion, Bray accepted a Buick Cutlass (a car) in lieu of some of the money that was supposed to be paid as part of the drug deal. In effect, Bray was shorting the government the value of the car. Bray, however, was caught on [a] recording discussing the "Cutty." When Bray was questioned about the conversation, he claimed it was a comment about a "Caddy" (Cadillac) that he had been interested in purchasing, but Lucas stepped in on Bray's behalf and asserted that "Cutty" was another term for drugs.
>
> Efforts to corroborate Bray's information were stymied by Bray, and law enforcement disregarded accepted protocol. For example, the first step in a controlled buy was typically a controlled phone call to the target. Appellants produced evidence indicating that Bray dialed identical telephone numbers for unrelated suspects and lied about which suspects he was calling and that the official reports did not accurately reflect the phone conversations Bray had. Bray at times turned off his wireless transmitter during buys. Metcalf also admitted that "the manner in which the Webb deal was conducted violated DEA procedures" and "was not the way that a standard deal should go."

*Ibid*. Bray pleaded guilty to two counts of perjury and five counts of violation of civil rights.[1] The government dismissed the charges against all Operation Turnaround targets and prosecuted Metcalf and Lucas. Metcalf pleaded guilty to one count of violating Dwayne Nabors's civil rights by falsely testifying in his criminal trial. The United States charged Lucas with making false statements, violation of civil rights, obstruction of justice, and perjury. The jury found Lucas not guilty. Despite the verdict, a 2011 OIG investigation concluded that Lucas falsified reports and testimony to corroborate Bray's false identifications.

---

[1]Bray died in prison in September 2012.

**B. Targeting Webb**

According to Lucas's DEA Report of Investigation (DEA-6 report), the Webb drug buy was set up in a recorded phone call between Bray and Webb on October 13, 2005. In the recorded call, titled DEA Exhibit N-17 (N-17 recording), the two spoke about selling cars. At one point, the call transcript shows that Webb said that he entered into an automobile transaction for $1000 "and the H." In 2010, Webb clarified that "H" was a mis-transcription for "eighth," which was a unit of measurement for drugs that he had sold to an unrelated party in the past. Law-enforcement officers did not recognize the error or its meaning at the time. The recorded conversation contained no other references to drugs. Towards the end of the call, Bray stated that he would have "a couple stacks tomorrow" for Webb. Lucas reported that "'two stacks' tomorrow" was "code for $2000 to purchase crack." Webb admits to having this conversation with Bray. However, he disputes that "a couple stacks" referred to drug-buy money and that the conversation took place on October 13. The DEA searched phone records but was unable to find evidence of a call between Webb and any phone number that was associated with Bray on October 13. Bray also denied that the call occurred on October 13 in an interview with OIG investigators.

At approximately 4:00 PM on October 14, 2005, Lucas, Cross, Metcalf, Mayer, and Verhiley accompanied Bray to a controlled drug buy at a Mansfield gas station with an individual Bray falsely identified as Webb. Lucas drove to the gas station where Bray awaited him in a car with tinted windows. The other officers followed in separate cars and provided surveillance. Lucas got into the back seat of Bray's car. While in Bray's car, Bray introduced to Lucas the person sitting in the passenger seat as "Josh," i.e., Joshawa Webb. In fact, "Josh" was Jeremiah Conrad. Bray testified that he selected Conrad to act as Webb's stand-in because they were similar in appearance—both were white males with shaved heads and visible tattoos. However, whereas Webb was 6'3" tall and weighed 260 pounds, Conrad was only 5'9" tall and, as Bray testified, was not "husky" or "stocky" like Webb. Conrad also did not have missing teeth and did not wear an earring as Webb did. Conrad testified that his tattoos, which included a "FTW" tattoo on the right side of his neck and a Chinese character on the left side of his neck, could not have been mistaken for the "bizarre" tattoos that Webb had. Webb alleges that Mayer

shot a videotape of the transaction, which has since disappeared, that included a clear shot of Conrad through the front windshield. Webb's Br. at 15. Bray stated in an early interview with OIG investigators that he watched this video at a later time with Lucas, Metcalf, and Mayer, and that Metcalf expressed skepticism that the person in Bray's passenger seat was Webb but that Lucas shut Metcalf down. Lucas's DEA-6 report does not mention the videotape, but Lucas later blamed Mayer for the missing videotape. The transaction was captured on an audio recording device that Lucas wore while in Bray's car. This recording was titled DEA Exhibit N-18 (N-18 recording). Three forensic experts have concluded that someone had tampered with the N-18 recording.

After the deal ended, Lucas viewed a photograph of Webb and confirmed that the person he met in the car was in fact Webb. On the sole basis of Lucas's report, an Assistant United States Attorney brought charges against Webb. Lucas testified against Webb before a grand jury on November 8, 2005:

> October 14, 2005 Joshawa Webb, another one of their guys that was involved out there, dealing with a lot of—he was the connection to a lot of the white guys that were buying drugs. I was introduced to Joshawa Webb. I met him in a parking lot. He had several contacts with the police before. He was real careful on the phone. I had to go meet him, do the deal. We didn't have—the contact before would say we've got two stacks. A stack is $1,000. I met him with the informant, got in the back seat of the car, he pulled out 85.4 gross grams of crack cocaine, was 2–and–a–half ounces. I think it weighed 63 grams, something like that when I weighed it out. He pulled it out of his pocket, pulled out the scale, weighed it. Turned around, weighed it on the center console, I gave him I think it was 2000 or $2,500 that day I bought from Joshawa Webb on October 14, 2005.

*Webb*, 2013 WL 1303776, at *14. On the basis of this testimony, the grand jury returned an indictment against Webb for drug-related offenses on November 9, 2005. Lucas and two other police officers arrested Webb on the same day.

## C. Targeting Price

On October 25, 2005, Bray told law-enforcement officers that he could set up a controlled buy with an individual named "Ronald Davis." "Ronald Davis" was an alias used by Herman Price, but Bray did not learn of this until after Price had been indicted and arrested. In 2003, Price fled Michigan after he pleaded guilty to state drug and gun offenses and agreed to a

seven-year term of incarceration.  Price paid his brother-in-law, the actual Ronald Davis, one thousand dollars for the use of Davis's name, birth certificate, and Social Security card so that Price could hide his criminal record.

Also on October 25, 2005, Metcalf and Lucas recorded and monitored two calls that Bray placed to set up the controlled buy.  According to Lucas's report, at 2:05 PM, Bray called a phone number associated with Price.  Bray actually called his own girlfriend's cellphone and spoke with Shay Shay Moxley, a female friend of his girlfriend, to set up a controlled buy.  Lucas's DEA-6 report noted that Bray spoke to a woman named "Lil S" about the drug deal.  At 2:08 PM, Metcalf and Lucas monitored and recorded a second call that Bray placed to Marcus English, whom Bray identified to the officers as Price.  English was in fact Price's cousin.  After identifying himself and exchanging pleasantries with English, Bray said "I'm about to come.  I need to holler at you."  The two then agreed to meet on South Adams Street ten minutes later.

After these calls, Faith and Metcalf drove to Price's home on 121 Glessner Avenue. According to Lucas's DEA-6 report and Faith's affidavit for a search warrant of the home, Faith and Metcalf identified Price, observed him departing 121 Glessner Avenue in a silver car, and followed him to 187 South Adams Street.  Faith and Metcalf would later admit that they did not see anyone depart 121 Glessner Avenue.  While they saw *someone* driving a silver Caprice on Glessner Avenue, they neither identified the driver nor attempted to follow him.  The driver of the silver car was actually English, not Price.  Faith's affidavit noted that "Price" drove a Chevy Caprice with the license plate DOJ-6183, which ultimately was found to be registered to English's girlfriend.  Lucas wrote in his report that "Price" drove a Lincoln, which was the type of car registered to Price.  At the same time, Lucas drove to 187 South Adams Street and dropped off Bray, who was wearing a concealed recording device.  English arrived shortly thereafter, met Bray outside of the house, and entered the house with Bray.  Inside the house, Bray asked to buy drugs from English, and English responded that "I can definitely get it." English also told Bray that "I got your number . . . .  I'll call you back with a price."  After this conversation, Bray left the house and called Shay Shay to tell her that he was coming to her on Glessner Avenue.  Bray then told Lucas that they needed to return to Glessner Avenue to buy drugs from "Price's girl."  Lucas agreed, even though he had monitored the conversation inside

the house and therefore should have known that Bray and English/Price had made no such agreement.

According to Bray's 2007 statements to OIG investigators, while driving back to Glessner Avenue to buy drugs from "Price's girl," Bray disclosed to Lucas that Bray's friend Shay Shay was actually the one bringing the drugs. At that point, Lucas told Bray to turn off the recorder. After turning off the recorder, Bray explained that he was using Shay Shay as a stand-in to frame Price, and Lucas allegedly agreed to the scheme. Bray later recanted this allegation while testifying at Lucas's criminal trial in 2010. Nonetheless, the audio recording captured Lucas telling Bray to shut off his recorder.

Bray and Lucas picked up Shay Shay, whom Bray falsely identified as Geneva France, near 121 Glessner Avenue, and Bray turned the recorder back on. Lucas bought drugs from Shay Shay in the car. Lucas claimed that the drugs were "a little light" and asked Bray to call Price and reduce the sales price. Bray testified at Lucas's criminal trial that he pretended to dial the phone and had a fake conversation with Price, in which Price supposedly agreed to give $200 back, in order to strengthen the evidence of Price's involvement. Phone records confirm that Bray did not call Price, or anyone else, at that time. Lucas nonetheless reported and testified that he heard Price instruct Shay Shay to give a $200 discount on the other end of Bray's non-existent phone call. After the deal, Lucas reported and testified that Bray called Price again and that Price let Bray know that he had followed them and "watched everything go down." There is also no record that this second call ever took place.

On November 8, 2005, Lucas gave the following testimony before a federal grand jury:

On October 25, 2005 in Mansfield, Ohio an informant made tape recorded telephone calls to Ronald Davis, setting up a purchase of two-and-a-half ounces of crack cocaine. I went with the informant to an address on South Adams Street. The informant got out of the car, met with Ronald Davis. The informant had a tape recorder. At this time Ronald Davis had a pistol in his hand when he met with the informant. Ronald Davis directed us to go over to his residence, down a couple of streets, 121 Glessner Avenue.

We drove down – we left Ronald Davis there, we went over to Glessner Avenue, which he told us this girl would be waiting for us. And we pulled up a young girl named – she told me her name was Little S, she was subsequently identified as Geneva France, got into the car, got in the back seat. She handed me two-and-a-

half ounces of crack, scales, she had her own scale, we weighed it out. I gave her $2,500.

The problem was it weighed light, it was supposed to be two-and-a-half, he gave me two-and-a-quarter so I had the informant call and tell him I wasn't going to pay that much. He said take $200 out of it. We spent $2300 that I ended up giving to Geneva France at his direction, Ronald Davis' direction.

Then we dropped Geneva France off, she went back to the house. We made telephone contact afterwards with Davis because he said he wanted to talk to us after. As we drove back to South Adams Street where he was he said no, everything was fine. He followed us and watched the deal as it happened to make sure we didn't try to rip off his girl. At that point the deal was over.

The grand jury indicted Price on November 9, 2005. On that date, Faith obtained a state-court search warrant for 121 Glessner Avenue. On November 10, Police found Price inside the residence and arrested him. A search of the premises resulted in the seizure of drugs and guns. Price was charged with possession with intent to distribute crack cocaine based on the October 25, 2005, drug deal. On February 6, 2006, the government dismissed the grand-jury indictment for the October 25, 2005, drug deal in exchange for a guilty plea based on the drugs recovered from the search of Price's home.

### D. Procedural Background

After Bray revealed in July 2007 that he had framed Operation Turnaround targets, the government permitted Price to withdraw his guilty plea and dismissed charges against Webb and Price. Price was turned over from federal custody to the custody of Michigan law-enforcement officials to serve his state-court sentence. Webb and Price filed separate civil actions against the Defendants.

Webb filed a complaint on October 24, 2007, which he later amended, against Richland County and RCSO Officers Metcalf, Mayer, and Faith; the City of Mansfield; DEA Agents Lucas and Cross; DEA Task Force Officer Ansari; Richland County Parole Officer Dan George; and various unnamed defendants. The amended complaint asserted claims against Richland County law-enforcement officers for false arrest, malicious prosecution, fabrication of evidence, and conspiracy under § 1983; identical claims against DEA officers under *Bivens*; and Ohio state-law tort claims against all law-enforcement officers for false arrest, malicious prosecution, trespass, intentional infliction of emotional distress, and conspiracy. The United States

substituted itself for the federal Defendants pursuant to the Westfall Act.  *See* 28 U.S.C. § 2679(d)(1).  This substitution converted state-law tort claims against Lucas, Cross, and Ansari into FTCA claims against the United States.  *See Osborn v. Haley*, 549 U.S. 225, 230 (2007).

The district court initially granted summary judgment to the individual Defendants on all claims.  In light of our decision in *Westerfield v. United States*, 366 F. App'x 614 (6th Cir. 2010) (holding that a district court abused its discretion in dismissing Operation Turnaround claims without first permitting discovery on qualified immunity), the district court reversed the grants of summary judgment to Lucas, Metcalf, Mayer, and Cross and permitted Webb to engage in limited discovery on the qualified-immunity question.  The district court again granted summary judgment to Lucas, Metcalf, Mayer, and Cross on March 28, 2013, holding that Webb's claims failed because the grand-jury indictment established probable cause to arrest and prosecute him. *Webb*, 2013 WL 1303776, at *21.  The court also determined that Cross, Mayer, and Metcalf did not have a material role in the decision to prosecute Webb and that Webb failed to allege with sufficient specificity the actions that each Defendant took in furtherance of the alleged conspiracy.

Webb moved for reconsideration on the ground that the Defendants failed to turn over pertinent discoverable documents before summary judgment was granted.  These documents included a summary of Bray's 2007 interview, in which he told federal investigators that Lucas conspired with him to frame Webb, and the OIG's 2011 report on Operation Turnaround, which concluded that Lucas and other law-enforcement officers had falsified reports and testimony to corroborate Bray's false identifications.  On March 18, 2014, the district court adhered to its summary-judgment ruling and also granted summary judgment for the United States because probable cause for Webb's arrest and prosecution foreclosed the FTCA claims.  Webb timely appeals and asks for reassignment to a different judge on remand.

Price filed his complaint on January 16, 2009, naming as defendants numerous law-enforcement officers, including Lucas, Cross, Ansari, Verhiley, Metcalf, Mayer, and Faith.  The complaint alleged the same claims as Webb did under § 1983, *Bivens*, and state law, with the addition that Price also alleged a federal conspiracy claim under 42 U.S.C. §§ 1985 and 1986. The United States substituted itself for DEA officers Lucas, Cross, Ansari, and Verhiley,

converting state-law tort claims against them into FTCA claims against the United States. *See Osborn*, 549 U.S. at 230.

The district court held that Price lacked standing to bring his lawsuit because he could not demonstrate an injury-in-fact. *Price v. Lucas*, No. 1:09-cv-118, 2013 WL 1303783, at *10 (N.D. Ohio Mar. 28, 2013). The district court further held that, even if Price had standing, qualified immunity shielded the individual Defendants from § 1983 and *Bivens* liability because there was probable cause to believe that Price sold drugs to Bray on October 25, 2005. *Id.*, at *11-15. The district court also held that Price's state-law and FTCA claims failed because he lacked standing and because there was probable cause to prosecute him. Price timely appeals, and we have consolidated his appeal with Webb's appeal.

## II. Standard of Review

We review a dismissal of a claim for lack of standing de novo. *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n,* 389 F.3d 536, 540 (6th Cir. 2004). We also review de novo a district court's grant of summary judgment on the basis of qualified immunity. *Dixon v. Univ. of Toledo*, 702 F.3d 269, 273 (6th Cir. 2012); *Simmonds v. Genesee Cnty.*, 682 F.3d 438, 444 (6th Cir. 2012); *Walker v. Davis*, 649 F.3d 502, 503 (6th Cir. 2011). Summary judgment is proper where, drawing all reasonable factual inferences in favor of the nonmoving party, no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III. Analysis

### A. Price's Standing

"Article III standing requires a litigant to have suffered an injury-in-fact, fairly traceable to the defendant's allegedly unlawful conduct, and likely to be redressed by the requested relief." *Nat'l Rifle Assn. of Am. v. Magaw*, 132 F.3d 272, 279 (6th Cir. 1997). The district court determined that "Price had expressly forfeited any right to his liberty when he plead[ed] to the Michigan charges" and so "cannot now assert injuries due to a deprivation of a right he no longer possessed." *Price*, 2013 WL 1303783, at *10. Accordingly, the district court held that Price could not demonstrate the injury-in-fact element for standing to bring this action because "he

should have been in custody in the state of Michigan for the entire time he was arrested and held in this matter." *Ibid.*

Price pleaded guilty to specific state-law drug and gun offenses and agreed to be imprisoned only for those offenses. To the extent that he forfeited any Fourth Amendment rights by pleading guilty, he did not forfeit his Fourth Amendment right to be free from imprisonment for unrelated crimes that he did not commit.

In addition to fugitives like Price, every inmate in state and federal prisons is serving a term of imprisonment following conviction for an offense. Under the district court's reasoning, each of these inmates would also have forfeited all of his Fourth Amendment rights regarding false imprisonment and malicious prosecution, and the government would have free rein to frame any of them for any other crime. Neither precedent nor common sense supports this outcome. While inmates have a diminished expectation of privacy, *see Bell v. Wolfish*, 441 U.S. 520, 557 (1979), they retain their Fourth Amendment right to be free from searches and seizures that are objectively unreasonable in light of those diminished expectations. *See, e.g., Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992). Because it is objectively unreasonable to frame an inmate, we reverse the district court's judgment and hold that Price properly alleged that he suffered an injury-in-fact when government agents allegedly framed and maliciously prosecuted him for a crime that he did not commit.

## B. *Bivens* and § 1983 Claims

We review *Bivens* and § 1983 actions under the same legal principles, except for the requirement of federal action under *Bivens* and state action under § 1983. A plaintiff must prove two elements to prevail on either type of claim: (1) that he was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law. *Marcilis v. Twp. of Redford*, 693 F.3d 589, 595 (6th Cir. 2012); *Redding v. St. Edward*, 241 F.3d 530, 532 (6th Cir. 2001). Because the law-enforcement Defendants indisputably acted under color of law, the key issue is whether they deprived Webb and/or Price of a right secured by the Constitution or laws of the United States.

### 1. Qualified Immunity

"Under the doctrine of qualified immunity, government officials performing discretionary functions . . . generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Meals v. City of Memphis*, 493 F.3d 720, 729 (6th Cir. 2007) (internal quotation marks omitted). Qualified immunity is an affirmative defense that protects government officials from liability "when a reasonable official in the defendant's position would not have understood his or her actions to violate a person's constitutional rights." *Ibid.*

After a defendant raises a qualified-immunity defense, the burden shifts to the plaintiff to demonstrate that the government official violated a right that was so clearly established "that every 'reasonable official would have understood that what he [was] doing violate[d] that right.'" *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)). In analyzing an assertion of qualified immunity, courts ask (1) whether, viewing the evidence in the light most favorable to the injured party, a constitutional right has been violated; and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). "To establish a § 1983 [or Bivens] claim against a public official in his personal capacity, a plaintiff must show that the official either actively participated in the alleged unconstitutional conduct or 'implicitly authorized, approved or knowingly acquiesced in the alleged unconstitutional conduct of an offending subordinate.'" *Scott v. City of Cleveland*, 555 F. Supp. 2d 890, 896 (N.D. Ohio 2008) (quoting *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003)).

### 2. Malicious Prosecution

Freedom from malicious prosecution is a clearly established Fourth Amendment right. *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010). To succeed on a malicious-prosecution claim under *Bivens* or § 1983, a plaintiff must prove the following: (1) the defendant made, influenced, or participated in the decision to prosecute the plaintiff; (2) there was no probable cause for the criminal prosecution; (3) as a consequence of the legal proceedings, the plaintiff suffered a deprivation of liberty apart from the initial arrest; and (4) the criminal proceeding was resolved in the plaintiff's favor. *Id.* at 308-09. As there is no dispute that Webb and Price were

deprived of their liberty as a result of criminal proceedings that were resolved in their favor, we focus on the first and second elements.

Within the meaning of the first element, "the term 'participated' should be construed within the context of tort causation principles. Its meaning is akin to 'aided.' To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Id.* at 308 n.5. As to the second element, probable cause to initiate a criminal prosecution exists where "facts and circumstances [are] sufficient to lead an ordinarily prudent person to believe the accused was guilty of the crime charged." *MacDermid v. Discover Fin. Servs.*, 342 F. App'x 138, 146 (6th Cir. 2009) (internal quotation marks omitted). Webb and Price were arrested and charged following grand-jury indictments. As a general rule, "the finding of an indictment, fair upon its face, by a properly constituted grand jury, conclusively determines the existence of probable cause." *Barnes v. Wright*, 449 F.3d 709, 716 (6th Cir. 2006). An exception to this general rule applies when defendants knowingly or recklessly present false testimony to the grand jury to obtain the indictment. *Martin v. Maurer*, 581 F. App'x 509, 511 (6th Cir. 2014); *Robertson*, 753 F.3d at 616.

**a. Webb's Malicious-Prosecution Claim**

**i. Probable Cause to Prosecute Webb**

The district court held that Lucas did not recklessly or knowingly make false statements in his grand-jury testimony against Webb. According to the district court, the grand-jury indictment against Webb therefore prevented him from meeting the "no probable cause" requirement for malicious prosecution. *Webb*, 2013 WL 1303776, at *15. We disagree with this conclusion for two reasons.

First, Bray's 2007 statements to OIG investigators that Lucas was a knowing participant in the scheme to frame Webb establishes a genuine issue of material fact as to whether Lucas lied in his grand-jury testimony. Bray told investigators that he used a DEA-provided device to record a face-to-face conversation with Webb on the day before the drug buy targeting Webb, but Webb made no incriminating statements. Bray told Lucas that he would be unable to get

Webb to sell drugs at a controlled buy, but Lucas instructed him to "do what he had to do." That night, Bray paid Conrad $200 to act as a stand-in for Webb for the following day.

In his first five interviews with federal investigators, Bray repeated his claim that Lucas was an active participant in the stand-in scheme against Webb. However, Bray later recanted these allegations at Lucas's criminal trial in 2010, where he testified that he acted alone to frame Operation Turnaround targets and lied about Lucas's participation in the Webb drug buy.

The Defendants argue that we should not credit Bray's initial allegations because he recanted them at Lucas's criminal trial. But it is commonplace for individuals to make contradictory statements. When this occurs, we permit litigants to use inconsistencies to impeach or discredit those statements and leave it to a fact-finder to determine whether one statement is more truthful than the other. *See United States v. Dobson*, 529 F. App'x 536, 539 (6th Cir. 2013) ("Factfinders regularly face recanting witnesses, and must decide whether to credit one version of the events over another, or to disregard them all."). It is for the jury to determine whether Bray was telling the truth in his first five interviews with federal investigators, Lucas's criminal trial, or neither.

Lucas argues that the "sham affidavit" doctrine prevents us from crediting Bray's initial statements. This doctrine prevents a party from submitting a new affidavit to manufacture a factual dispute by contradicting an *earlier* testimony. *Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 907 (6th Cir. 2006). The doctrine is not applicable because the statements that Lucas seeks to discredit do not contradict Bray's earlier statements. Rather, they *are* the earlier statements. Because "[r]ecantation testimony is properly viewed with great suspicion," *Dobbert v. Wainwright,* 468 U.S. 1231, 1233-34 (1984) (Brennan, J., dissenting from denial of certiorari), we will not at this stage credit Bray's recantation at Lucas's criminal trial over his earlier statements to federal investigators.

"To make out a *genuine* issue of material fact, [a] plaintiff must present significant probative evidence tending to support her version of the facts, *evidence* on which a reasonable jury could return a verdict for her." *Chappell v. City of Cleveland*, 585 F.3d 901, 913 (6th Cir. 2009). Bray's initial claim that Lucas knowingly participated in the stand-in scheme does not stand by itself. It is bolstered by federal investigators' finding that "Lucas wrote and testified

[falsely] to corroborate Bray and 'cover-up' Bray's other misconduct."**2** *Cf. United States v. Hadley*, 431 F.3d 484, 510-14 (6th Cir. 2005) (holding that a sentencing court did not commit error by relying on a domestic-abuse victim's initial statements even though she recanted those statements later, because the initial statements were corroborated by other evidence). Viewing the evidence "in the light most favorable to the injured party," *Saucier*, 533 U.S. at 201, as we must when making a qualified-immunity determination, there is a genuine issue of material fact as to whether Lucas was an active participant in Bray's stand-in scheme. This would mean that the grand-jury indictment could not be the basis for probable cause because it was tainted by Lucas's knowingly false testimony that it was Webb who sold him drugs on October 14, 2005.

Even if Lucas had not been a participant in Bray's scheme, the jury could reasonably conclude that Lucas knowingly or recklessly testified falsely against Webb because he should have recognized that Conrad—the stand-in Bray used for Webb at the October 14 controlled buy—was not Webb. Lucas maintains that he continues to believe that Bray introduced him to Webb—rather than Conrad—on October 14, 2005, to conduct a controlled buy. Lucas's Br. (14-3443) at 11. For summary-judgment purposes, we must accept Webb's assertion that Lucas in fact met Conrad, who was acting as a stand-in for Webb. This means that, even though Lucas's sole objective at the drug buy was to confirm the identity of the person seated next to Bray, he misidentified Conrad as Webb. Because he testified to the grand jury that he bought drugs from Webb, his testimony contained a false statement. The key question is whether Conrad so closely resembled Webb that it was objectively reasonable for Lucas to have confused Conrad for Webb. *See Anderson*, 483 U.S. at 639.

Webb argues that he and Conrad had noticeably different appearances. Whereas Webb was 6'3" tall and weighed 260 pounds, Conrad was only 5'9" and was slight in build. Conrad testified in an affidavit that he has known Webb for many years and that the two of them differ in appearance in "several important ways." In addition to the obvious size difference, Conrad noted that, unlike Webb, he was not missing teeth and wore no earrings at the time of the drug deal.

---

**2**The 2011 OIG report suggests that Lucas lied only after he "became aware that some defendants alleged that Bray lied or was mistaken," which could only have occurred *after* his grand-jury testimony that led to Webb's indictment and arrest. However, all of Lucas's reporting occurred *before* his grand-jury testimony on November 8, 2005. Therefore, if the OIG report were correct that Lucas lied in his reports to cover up for Bray, he must have begun to do so *before* Operation Turnaround targets alleged that Bray was lying.

Conrad further stated that his "FTW" and Chinese-character tattoos could not have been mistaken for the "bizarre" tattoos that Webb had at the time.

Webb argues that Lucas should have noticed these differences when Lucas spent several minutes in a hand-to-hand transaction at approximately 4:00 PM with Conrad. The question of whether two individuals resemble one another is an issue of fact. Webb put this issue into dispute by pointing to evidence that Webb looked different from Conrad. We must draw factual inferences in favor of Webb unless the Defendants can show that no reasonable jury could find that Webb looked significantly different from Conrad. The Defendants' counterarguments do not make this showing. First, the Defendants argue that Conrad's comparatively small stature would not have been apparent because he was sitting in a car. But, as Webb notes in his brief, "every indicia of height and weight does not disappear just because someone is seated, particularly inside a car where there are frames of reference." Webb's Br. at 58. The differences were particularly acute in this case because Conrad was half a foot shorter than Webb and was of slimmer build. Second, the Defendants argue that Conrad and Webb looked similar because they were both white men with shaved heads and visible tattoos. But nothing suggests that two had similar facial features. Tattoos may obscure some facial differences but, if they are different in pattern and location, they may *enhance* the distinctiveness between Webb and Conrad rather than minimize them. In the absence of contrary evidence, we must credit Conrad's affidavit that Webb's tattoos were distinctive.

The district court nonetheless concluded that Conrad looks like Webb even though there is no indication that the court compared any images of Conrad and Webb. The district court relied instead on Bray's testimony that he chose someone whom he believed to resemble Webb. But that resemblance extended only to skin tone and hairstyle; Bray also testified that Conrad was not stocky like Webb, and his testimony did not contain any indication that the two had similar facial features. It is unlikely that Bray had a large number of associates who were willing to act as stand-ins in drug deals.[3] At best, Conrad was the person who most resembled Webb from the limited pool from which Bray was able to draw. The evidence suggests that there was ample room for variation in height, build, facial features, and tattoo patterns between Conrad and

---

[3]Bray used Darren Transou, for example, as a stand-in for two different Operation Turnaround targets.

Webb that would have been apparent at close proximity in broad daylight. Therefore, it remains a genuine issue of material fact whether Conrad looked like Webb.

A law-enforcement defendant is deliberately indifferent—and therefore not entitled to qualified immunity—if he mistakenly identifies an individual as a suspect when the individual does not match the suspect's description. In *Gray v. Cuyahoga County Sheriff's Department*, the plaintiff was mistakenly incarcerated due to an identity error even though his jailers had in their possession the photograph and physical description of the suspect who was supposed to be incarcerated. 150 F.3d 579, 582 (6th Cir. 1998). We denied qualified immunity to the jailers and held that, in light of apparent differences between the suspect and the plaintiff,

> the principal question for the trier of fact will be whether [the jailers] acted with something akin to deliberate indifference in failing to ascertain that [the plaintiff] they had in custody was not the person wanted by Michigan authorities . . . . This question will require resolution whether the defendants proceed on the merits, or whether they reassert the defense of qualified immunity.

*Id.* at 583. Because there is a dispute of material fact as to whether Webb and Conrad looked alike, we cannot determine that it was objectively reasonable for Lucas to believe that the person who sold him drugs on October 14, 2005, was Webb unless he undertook appropriate efforts to confirm Webb's identity in light of potential differences. Nothing in the record indicates that Lucas undertook such efforts. Accordingly, a jury could reasonably conclude that Lucas's grand-jury testimony contained knowing or reckless falsehoods as to the identity of the person who sold him drugs, and therefore the grand-jury indictment against Webb cannot be the basis for probable cause at summary judgment.

Absent Lucas's allegedly false testimony, the only remaining evidence against Webb was information supplied by Bray. Information from a confidential informant who has been established as reliable can serve as the basis for probable cause. *Illinois v. Gates*, 462 U.S. 213, 232 (1983). But the law-enforcement Defendants could not have reasonably relied on Bray's information to establish probable cause because they were aware that, while acting as a confidential informant, Bray was arrested for cocaine possession, provided false tips, and stole money from the Defendants. *See Mott v. Lucas*, No. 1:10-cv-164, 2011 WL 2938145, at *11-14

(N.D. Ohio July 15, 2011). Therefore, we reverse the district court's holding that there was probable cause to prosecute Webb.

### ii.     Whether Each Defendant Participated in the Decision to Prosecute Webb

Because the grand jury indicted Webb solely on the basis of Lucas's testimony, there is no doubt that Lucas participated in the decision to prosecute Webb. Further, the federal prosecutor who prosecuted Webb testified that he consulted with Lucas about Operation Turnaround cases and relied on information supplied by Lucas in deciding whether to bring charges. The district court concluded that the remaining individual Defendants—Cross, Mayer, Metcalf, Faith, and Ansari—played only passive and neutral roles. *Webb*, 2013 WL 1303776, at *16-18.

- **DEA Agent Cross**

While Cross was at the scene of the Webb controlled buy and met with the prosecutor, he could not see the participants and so would have had no reason to believe that a stand-in played the role of Webb. Webb nonetheless argues that Cross aided in his prosecution because Cross shared custody of the N-18 recording of the October 14, 2005, drug buy, and therefore he could have been one of several individuals who potentially manipulated that recording to falsely incriminate Webb. Webb's Br. at 67. But the N-18 recording was not presented to the grand jury, and the prosecutor testified that he generally does not listen to audiotapes before determining whether to bring charges against a person. Webb provides no evidence that the prosecutor relied on the altered recording in this case. Therefore, Cross did not aid in Webb's prosecution.

- **RCSO Detective Mayer**

The prosecutor testified that he did not consult with Richland County officers in deciding to prosecute any of the Operation Turnaround targets. Webb nonetheless argues that Mayer aided in his prosecution in two ways: (1) doctoring the N-18 recording and (2) destroying a videotape of the drug buy that would have shown that the drug dealer was not Webb. As with Cross, because the doctored audio recording could not be shown to have affected the grand jury's decision to indict or the prosecutor's decision to charge Webb, it could not be the basis of a

malicious-prosecution claim.  The same argument applies with respect to the missing videotape.  Therefore, Mayer did not aid in Webb's prosecution.

- **RCSO Detective Metcalf**

Webb argues that, in addition to potentially altering the N-18 recording, Metcalf aided in the decision to prosecute him by misdating the N-17 recording of a conversation between Webb and Bray as having taken place on October 13, 2005, the day before the drug buy for which Webb was prosecuted.  Metcalf does not deny this allegation, and argues only that the date of the recording is immaterial.  Metcalf's Br. (14-3443) at 18-19.  Metcalf is mistaken.  The N-17 recording indicates that Bray agreed to pay Webb "a couple stacks tomorrow."  If the recording had occurred on a date other than October 13, then it could not have been evidence of an agreement to transact for drugs on October 14.   Webb presented phone-record evidence indicating that the recorded call did not occur on October 13.  Drawing factual inferences in Webb's favor, we presume that Metcalf misdated the call.

Due to Metcalf's well-documented Operation Turnaround-related misconduct, including concealing exculpatory video evidence, altering the transcripts of recordings, and perjury, a reasonable jury could conclude that Metcalf's misdating was not a good-faith mistake, but was an attempt to falsely incriminate Webb.  Lucas's grand-jury testimony that led to Webb's indictment and DEA-6 report that convinced the prosecutor to pursue charges against Webb relied on the misdated recording to show that Webb agreed to sell Bray drugs on October 14, 2005.  *Webb*, 2013 WL 1303776, at *14.  Accordingly, a reasonable jury could conclude that Metcalf aided in Webb's prosecution by influencing Lucas to testify falsely before the grand jury and by influencing the prosecutor's decision to bring charges.

- **RCSO Detective Larry Faith and DEA Task Force Officer Jamal Ansari**

Webb concedes that, with respect to Ansari and Faith, "there is no evidence of their personal misconduct . . . ."  Webb's Br. at 70.  He argues that they are nonetheless liable because "there is plenty of evidence establishing their complicity in the broader Operation Turnaround conspiracy."  *Ibid.*  But "to overcome a qualified immunity defense, an individual must show that his or her *own* rights were violated, and that the violation was committed *personally* by the

defendant." *Robertson*, 753 F.3d at 615; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[P]laintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."). While Ansari and Faith may have violated the clearly established constitutional rights of *some* Operation Turnaround targets, Webb does not show that they violated *his* clearly established rights. Therefore, Ansari and Faith are entitled to summary judgment on the basis of qualified immunity with respect to Webb's malicious-prosecution claim.

Accordingly, we affirm grants of qualified immunity as to Cross, Mayer, Faith, and Ansari with respect to Webb's § 1983 and *Bivens* malicious-prosecution claims. We reverse as to Lucas and Metcalf.

**b.      Price's Malicious-Prosecution Claim**

**i.      Probable Cause to Prosecute Price**

The district court held that Price failed to meet the "no probable cause" requirement for malicious prosecution because "Lucas had probable cause to pursue charges against Price . . . ." *Price*, 2013 WL 1303783, at *12. While "[i]n section 1983 cases, the existence of probable cause usually poses a jury question," *Painter v. Robertson*, 185 F.3d 557, 570 (6th Cir. 1999), the Defendants argue that, because Lucas did not recklessly or knowingly make false statements in his grand-jury testimony, the grand jury's indictment against Price established probable cause as a matter of law. *See* United States's Br. (14-3444) at 25-26. We disagree for two reasons.

First, Bray's 2007 statements to OIG establish a genuine issue of material fact as to whether Lucas lied in his grand-jury testimony regarding the existence of probable cause. According to these statements, while Lucas was driving Bray from South Adams Street to Glessner Avenue to buy drugs from "Price's girl," Bray whispered to Lucas that the drug dealer they would soon meet was actually a friend of Bray, rather than Price's agent. Lucas told Bray to turn off the recording device he was wearing and allegedly approved the sham drug deal. The Defendants again argue that we should not credit Bray's initial allegations because Bray recanted them at Lucas's criminal trial. But for the same reasons as articulated in subsection III.B.2.a.i of

this opinion, the issue of whether Bray was telling the truth in his 2007 statements to OIG investigators or in his 2010 testimony at Lucas's trial is a question of fact for the jury.

Second, it remains a genuine issue of material fact whether it was objectively reasonable for Lucas to mistakenly identify English as Price. Price presented evidence that he looks nothing like English. The most obvious difference is size. Whereas Price was 5'8" tall, English stood 6'2". Lucas's DEA-6 report lists Price as being 5'10" tall. In Webb's situation, the stand-in was sitting inside a car. Here, Lucas saw English standing next to Bray, who was 5'9" tall, at 2:30 in the afternoon. A person who stood between 5'8" and 5'10" in height would have appeared to be approximately the same height as Bray. English would have appeared significantly taller. Further, Lucas looked at a photograph of Price immediately after the drug deal and still confirmed that it was Price who met Bray on South Adams Street. Other than the fact that both were black males, nothing suggests that Price's photograph resembled English. Accordingly, it remains an issue of material fact whether it was objectively reasonable for Lucas to have confused the two of them. *See Gray*, 150 F.3d at 582.

Drawing factual inferences in Price's favor, Lucas's grand-jury testimony contained knowing or reckless falsehoods and so we cannot conclude on summary judgment that the indictment provided a basis for probable cause to prosecute Price. The remaining evidence against Price came from Bray's information and the drugs seized at the November 10, 2005, search of Price's home. Neither supports probable cause to prosecute Price. Bray's information cannot establish probable cause because he was an unreliable informant. *See Gates*, 462 U.S. at 232. The drugs seized at the November 10, 2005, search may provide probable cause to believe that Price committed *some* drug offense. But "[p]robable cause to prosecute exists [only] when the facts and circumstances are sufficient to lead a reasonable person to believe that the accused committed *the particular offense* with which he is charged." *Mott*, 524 F. App'x at 187. Because the search of Price's home took place the day after he was charged, evidence seized therein could not have furnished probable cause to charge him for the crime at issue here. *See id.* at 188. Accordingly, a reasonable jury could conclude that Price meets the "no probable cause" element of malicious prosecution.

**ii.     Whether Each Defendant Participated in the Decision to Prosecute Webb**

There is no question that Lucas participated in the decision to prosecute Price because Lucas testified against Price before the grand jury and "[b]ecause it is undisputed that the [Assistant] U.S. Attorney indicated he relied almost exclusively on Lucas's testimony, Reports and conversations" in deciding to bring charges against Price. *Price*, 2013 WL 1303783, at *14. The district court concluded that Price "cannot show [that the remaining individual Defendants] played any significant role in the decision to prosecute Price." *Ibid.* Price does not oppose the grants of summary judgment to Cross, Mayer, and Ansari, Price's Br. at 61, and so we review the district court's conclusion only with respect to Faith, Metcalf, and Verhiley.

- **RCSO Captain Faith and Detective Metcalf**

According to Lucas, Faith and Metcalf told him that they had observed Price previously and were familiar with his face. Lucas's Br. (14-3444) at 12. After the October 25, 2005, drug deal, Lucas stated that both Faith and Metcalf identified Price as the suspect who met with Bray, and Lucas relied on their representations in good faith to identify Price as the suspect in his DEA-6 report and grand-jury testimony. *Ibid.* Metcalf denies identifying Price for Lucas, Metcalf's Br. (14-3444) at 10, and Faith argues that "[i]t was Lucas, not Faith, who personally identified Price as the person who met with the confidential informant." Faith's Br. (14-3444) at 16. The question of who misidentified Price is one for the jury. At this stage, Lucas's testimony that he relied on Faith's and Metcalf's false identifications establishes a genuine issue of material fact as to whether Metcalf and Faith influenced Lucas's grand-jury testimony and thereby aided in the decision to prosecute Price. Therefore, we reverse the district court's grants of summary judgment to Faith and Metcalf.

- **DEA Task Force Officer Verhiley**

Price does not dispute Verhiley's assertion that he played no role in monitoring Bray's phone calls to set up the fake drug buy, observing the deal itself, or identifying Price as a participant in the deal. Price argues only that Verhiley was a part of the broader Operation Turnaround conspiracy. Though Price may demonstrate that his rights were violated by *some* Operation Turnaround participants, he cannot show that Verhiley was personally involved. *See*

*Robertson*, 753 F 3d at 615. Therefore, the district court properly granted summary judgment to Verhiley.

## 2. False Arrest

"A false arrest claim under federal law requires a plaintiff to prove that the arresting officer lacked probable cause to arrest the plaintiff." *Voyticky v. Vill. of Timberlake*, 412 F.3d 669, 677 (6th Cir. 2005). Probable cause is a defense to false arrest. *Walker v. Schaeffer*, 854 F.2d 138, 142 (6th Cir. 1988). The district court granted summary judgment against Webb and Price because it found that there was probable cause to arrest them on account of their grand-jury indictments. *See Price*, 2013 WL 1303783, at *15; *Webb*, 2013 WL 1303776, at *19.

Webb was arrested on November 9, 2005, by Lucas and two other law-enforcement officers who are no longer parties to this lawsuit. The question of whether Lucas had probable cause to believe that Webb had committed a crime remains a question of fact. Lucas cannot claim that he relied in good faith on the indictment to arrest Webb because, to the extent that the indictment was invalid, Lucas was responsible for the defects. *Gregory v. City of Louisville*, 444 F.3d 725, 758 (6th Cir. 2006) ("Police officers cannot, in good faith, rely on a judicial determination of probable cause [to absolve them of liability] when that determination was premised on an officer's own material misrepresentations to the court."). Therefore, Lucas is not entitled to qualified immunity. Webb does not allege that any of the other law-enforcement Defendants were at the scene of his arrest or that any of them implicitly authorized the unconstitutional conduct of a subordinate. Therefore, Cross, Metcalf, Mayer, Faith, and Ansari are entitled to summary judgment as to Webb's false-arrest claim.

Price was arrested on November 10, 2005, by United States Marshals and an unnamed detective. Price argues that the Defendants "deliberately and willfully caused [his] wrongful arrest." But neither his complaint nor his brief alleges that any of the Defendants actively participated in his false arrest, and Price does not allege that they implicitly authorized their subordinates to falsely arrest him. Therefore, all individual Defendants are entitled to summary judgment with respect to Price's false-arrest claim.

### 3. Fabrication of Evidence

"It is well established that a person's constitutional rights are violated when evidence is knowingly fabricated and a reasonable likelihood exists that the false evidence would have affected the decision of the jury." *Id.* at 737. "[A] reasonable police officer would know that fabricating probable cause, thereby effectuating a seizure, would violate a suspect's clearly established Fourth Amendment right to be free from unreasonable seizures." *Spurlock v. Satterfield*, 167 F.3d 995, 1006 (6th Cir. 1999).

**a.     Webb's Fabrication-of-Evidence Claims**

Webb raises three fabrication-of-evidence claims: (1) Lucas and Metcalf falsely dated the N-17 recording as having occurred on October 13, 2005; (2) Lucas, Metcalf, and Cross tampered with the N-18 recording; and (3) Lucas made false statements in his DEA-6 report.

**i.     Falsely Dating the N-17 Recording**

Among the evidence that was entered against Webb in his criminal trial was a phone conversation between Webb and Bray, titled N-17 and dated October 13, 2005, that was monitored and recorded by Metcalf. While DEA policy requires that a recorded call begin with a time-and-date header, that procedure was not followed in this case, and the recording was dated after the fact. The transcript of the recorded call does not contain any overt indications that Webb and Bray had arranged a drug deal. Instead, the two spoke about buying cars. Bray ended the conversation by telling Webb that he was going to "have a couple stacks tomorrow." Lucas wrote in his DEA-6 report that "two stacks" tomorrow was code for $2,000 to purchase crack and testified the same to the grand jury. *Webb*, 2013 WL 1303776, at *14 (internal quotation marks omitted).

Webb argues that Metcalf and Lucas fabricated evidence against him by misdating the call as occurring on October 13, 2005, so that it could be used as evidence of arranging the October 14, 2005, drug deal. Webb acknowledges that he had this conversation with Bray but denies that they discussed arranging a drug deal or that the conversation occurred on October 13, 2005. Bray indicated that the N-17 call was made on a Nextel phone given to him by the DEA, which is consistent with the recording's transcript. He also insisted that the recorded

conversation did not occur on October 13, 2005. The DEA examined phone records and found no evidence of a call between Webb and Bray on that date.

The district court granted summary judgment to Metcalf and Lucas on this issue because "it is undisputed that the date of the alleged October 13, 2005 conversation was not an issue or even disputed at *Lucas's criminal trial*." *Webb*, 2013 WL 1303776, at *19 (emphasis added). The fact that the United States did not contest the date of the call at a trial against its co-defendant in this case, however, does not establish the date of the call or its materiality. Lucas and the United States also point out that the transcript is labeled "10-13-05." United States's Br. (14-3443) at 29; Lucas's Br. (14-3443) at 39. This argument is circular and only establishes that the Defendants labeled the recording as such after the fact because it is undisputed that they did not follow standard protocol to create a time-and-date header at the time the recording took place.

Webb demonstrates a genuine issue of material fact as to the date of the recording because phone records and Bray's statements indicate that the recording did not occur on October 13, 2005. This factual dispute is material because, if the call did not occur on October 13, 2005, it would be unreasonable for anyone to believe that the participants planned to engage in a drug deal on October 14, 2005, even if Webb had unequivocally agreed to sell drugs in exchange for "two stacks" tomorrow. *See Gregory*, 444 F.3d at 757-58.

### ii.     Tampering with the N-18 Recording

Exhibit N-18 is a recording of the transaction that occurred in Bray's car between Conrad—in his capacity as Webb's stand-in—and Lucas on October 14, 2005. Three forensic experts used spectrographic analysis and other advanced techniques to identify evidence that someone had tampered with the recording to delete material.[4] The N-18 recording was recorded

---

[4] The first expert examined a CD containing an "undercover body wire" recording and the recording device that made the original recording and identified five anomalies on the recording that could not have been created through the normal functions of the recording device. He highlighted three anomalies of greatest concern, each of which contained "sudden changes in ambient sound such as music[, which,] combined with a signature or anomaly is an indication of an edited or altered recording." A second expert examined a copy of the recording and found the same three troubling anomalies. He was unable to determine their causes through the copied recording, and the original recording was no longer available. A third court-appointed expert examined a copy of the recording that was given to him by Cross and identified two deleted sections and concluded that both occurred before the main "drug conversation" and could have contained conversations between the "CI and his handlers." Two other experts

on Lucas's recording device.  Metcalf made an "original copy" on a CD, and Lucas and Cross took custody of the CD from Metcalf until "it was submitted to the Cleveland Resident Office Non-Drug Evidence Custodian."  Webb alleges that one or more of these three Defendants fabricated evidence against him by tampering with the N-18 recording.  Cross argues that he never had custody of the "original audiotape" that Lucas gave to Metcalf.  United States's Br. (14-3443) at 8.  But the "original audiotape" was the storage card on Lucas's recording device, and the forensic experts agreed that the recording device could not have been responsible for the deletions.  Therefore, the deletions must have been made either when Metcalf created the "original copy" CD or after Lucas and Cross took custody of that CD.  Lucas argues that any deletions to the N-18 recording would not have been material because loud music in Bray's car made the deleted portions inaudible.  *See* Lucas's Br. (14-3443) at 47.  But unaltered portions of the recording are comprehensible, and there is no way to know whether the deleted portions are inaudible because they were deleted, so this argument fails.  Under such circumstances, a reasonable jury could find that one or more of Defendants who had custody of the recording deliberately tampered with the evidence.

The district court nonetheless granted summary judgment to the Defendants because it concluded that Webb "has the burden to show some issue of fact as to what was deleted from the recording" but he "wholly fails to point to any evidence as to what would have been cut out or covered over." *Webb*, 2013 WL 1303776, at *20.  But it would surely be strange if Webb must furnish the content of the material excised from the recording when Webb was not a party to the recording, and the purpose of excising the material may have been to prevent Webb from accessing the material in the first place.  Webb only needs to show that "a reasonable likelihood exists that the [tampered] evidence would have affected the decision of the jury." *Gregory*, 444 F.3d at 737.  The N-18 recording captured the entire drug deal for which Webb was charged.  It was therefore reasonably likely that an altered recording would affect the jury's decision.

Willful spoliation of relevant evidence is generally punished by an adverse-inference jury instruction. *See Automated Solutions Corp. v. Paragon Data Sys., Inc.*, 756 F.3d 504, 513 (6th Cir. 2014); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 220 (S.D.N.Y. 2003).  Similarly, we

---

relied on solely visual and aural techniques to examine the N-18 recording and concluded that it contained no anomalies.

presume that unexplained tampering with relevant evidence would have an effect on the jury's decision. Because there is a dispute of fact as to whether one of the Defendants who had custody of the N-18 recording deliberately deleted portions that presumptively were reasonably likely to affect the jury's decision, it was improper for the district court to grant summary judgment to Lucas, Metcalf, and Cross.

### iii.      False Statements in Lucas's DEA-6 Report

Finally, Webb alleges that Lucas's DEA-6 report of October 14, 2005, contained false statements. Aside from allegedly falsely reporting the date of the N-17 recording, which was discussed above, these alleged falsehoods include the following: (1) Lucas reported that he and other officers met with Bray before the Webb drug buy, but the other officers stated that they did not meet Bray; (2) Lucas reported that he and Conrad/Webb exchanged money for drugs directly, but Bray and Conrad testified that Lucas exchanged money for drugs with Bray, then Bray passed the money to Conrad; and (3) Lucas falsely documented the person who sold him drugs as being 6'3" tall when he was only 5'9" tall.

The district court determined that these "alleged fabrications do not rise to the level of a constitutional violation." *Webb*, 2013 WL 1303776, at *20. This conclusion is correct as to the first two items because those discrepancies were not reasonably likely to affect the jury's decision. *See Gregory*, 444 F.3d at 737. But the misstatement about the suspect's height may have affected the jury's decision because truthfully reporting the height of the suspect as being 5'9" would have seriously undermined the case against a 6'3" defendant. Whether it was objectively reasonable for Lucas to mistake a 5'9" suspect to be 6'3" remains a factual question for the jury. Therefore, the district court improperly granted Lucas summary judgment with respect to this claim.

### b.      Price's Fabrication-of-Evidence Claims

Price brings numerous fabrication-of-evidence claims against Lucas, Metcalf, and Faith. First, Price alleges that Lucas's DEA-6 report and Faith's search-warrant affidavit falsely claim that Faith and Metcalf observed Price leaving his Glessner Avenue home and then followed him to South Adams Street. In fact, Faith admits that neither he nor Metcalf saw anyone leave

Price's home, nor did they make an attempt to follow anyone. Second, Lucas falsely identified the Caprice that the drug-buy suspect (English) drove to the South Adams Street meeting with Bray as a Lincoln, which was the type of car registered to Price. Third, Lucas falsely reported the suspect's description, including listing his height at 5'10" in his DEA-6 report when the suspect stood 6'2". Fourth, Lucas falsely reported and testified that he heard Price say "take two back" on a phone call that Bray placed. The record indicates that Bray only pretended to make that call, and so Lucas could not possibly have heard Price's voice saying anything.

The district court held that all individual Defendants were entitled to qualified immunity with respect to Price's fabrication-of-evidence claims because there was independent evidence to support probable cause. *Price*, 2013 WL 1303783, at *16. But there are genuine issues of material fact as to the existence of probable cause against Price. More importantly, even if independent evidence establishes probable cause against a suspect, it would still be unlawful for law-enforcement officers to fabricate evidence in order to strengthen the case against that suspect. *Stemler v. City of Florence*, 126 F.3d 856, 872 (6th Cir. 1997) ("A claim of fabrication of evidence does not require a conclusion that the state did not have probable cause to prosecute the claimant."). Accordingly, it was improper for the district court to grant summary judgment to Lucas, Metcalf, and Faith for fabricating evidence against Price on the basis that there was probable cause to charge Price.

### 4. Federal Conspiracy Claims

"A civil conspiracy under § 1983 [or *Bivens*] is 'an agreement between two or more persons to injure another by unlawful action.'" *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th. Cir. 2011) (quoting *Revis v. Meldrum*, 489 F.3d 273, 290 (6th Cir. 2007)). A plaintiff must show that (1) a "single plan" existed; (2) defendants "shared in the general conspiratorial objective" to deprive the plaintiff of his constitutional rights, and (3) "an overt act was committed in furtherance of the conspiracy that caused [the plaintiff's] injury." *Hooks v. Hooks*, 771 F.2d 935, 944 (6th Cir. 1985). "It is well-settled that conspiracy claims must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient to state such a claim under [*Bivens* or] § 1983." *Gutierrez v. Lynch*, 826 F.2d 1534, 1538 (6th Cir. 1987).

The district court held that neither Webb nor Price alleged with specificity the existence of a common plan among the law-enforcement Defendants.  *Price*, 2013 WL 1303783, at *16; *Webb*, 2013 WL 1303776, at *21.  But "[r]arely in a conspiracy case will there be direct evidence of an express agreement among all the conspirators to conspire, . . . [and] circumstantial evidence may provide adequate proof of conspiracy."  *Weberg v. Franks*, 229 F.3d 514, 528 (6th Cir. 2000).

The facts in this case provide circumstantial evidence that could enable a reasonable jury to infer the existence of a shared conspiratorial plan to frame Webb and Price.  Drawing factual inferences in Webb's favor, Metcalf misdated the N-17 recording of the conversation setting up the drug buy; Lucas, Metcalf, and/or Cross deleted exculpatory evidence from the N-18 recording of the drug buy; and Lucas testified and reported falsely about the misdated call and about what occurred at the drug buy.  While each of these alleged misdeeds may have occurred independently, they are sufficiently intertwined so as to suggest an agreement between the perpetrators.  Webb therefore presented sufficient evidence of a common plan between Lucas, Metcalf, and Cross to violate his rights.

Drawing factual inferences in Price's favor, Faith falsely reported that he and Metcalf saw Price leave his Glessner Avenue home and followed him to South Adams Street.  It is unlikely that Faith would have made this false report without at least having Metcalf's tacit support.  Lucas corroborated Faith's false report by falsely identifying the man who arrived on South Adams Street as Price in his report and grand-jury testimony.  This corroboration permits the inference of an agreement to falsely identify the arriving person.  Price therefore presented sufficient evidence of a common plan between Lucas, Metcalf, and Faith to violate his rights.

The district court also noted that "Plaintiff does not identify overt acts attributable to particular individuals."  *Price*, 2013 WL 1303783, at *13.  But the overt-act element requires only that at least one of the alleged conspirators committed an overt act or omission in furtherance of the conspiracy.  *Hooks*, 771 F.2d at 944.  The Plaintiffs have identified several overt acts, including false testimony, false reporting, and alteration of recordings.  Accordingly, we reverse the grants of qualified immunity as to Webb's § 1983 and *Bivens* conspiracy claims

against Lucas, Metcalf, and Cross, and as to Price's § 1983 and *Bivens* conspiracy claims against Lucas, Metcalf, and Faith.

The Plaintiffs' § 1983 and *Bivens* conspiracy claims against the remaining individual Defendants fail because those claims rely exclusively on misconduct in the wider Operation Turnaround context. Webb and Price were required to show that the remaining individual Defendants shared a common plan to violate *their* constitutional rights. *See Robertson*, 753 F.3d at 622. While the remaining individual Defendants may have been involved in framing other Operation Turnaround targets, Plaintiffs produced no evidence that any of them personally participated in framing Webb or Price, and therefore it cannot be inferred that these Defendants joined in a common plan to frame Webb or Price. *Ibid.*

Price also alleged that law-enforcement Defendants conspired to deprive him of his civil rights in violation of § 1985. To state a § 1985 claim, a plaintiff must allege "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges or immunities of the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Vakilian v. Shaw*, 335 F.3d 509, 518-19 (6th Cir. 2003). The Supreme Court requires that § 1985 claims contain allegations of "class-based, invidiously discriminatory animus." *Griffin v. Breckenridge,* 403 U.S. 88, 102 (1971*)*. The class must be based upon race or other "inherent personal characteristics." *Browder v. Tipton,* 630 F.2d 1149, 1150 (6th Cir. 1980). Because Price did not allege class-based discrimination and failed to provide evidence of class-based animus, the district court properly held that Defendants were entitled to qualified immunity as to the § 1985 claim. *See Vakilian,* 335 F.3d at 518-19.

### 5. State-Law and FCTA Claims

Webb and Price alleged state-law trespass, false-arrest, malicious-prosecution, intentional-infliction-of-emotional-distress, and conspiracy claims against the individual Defendants. The United States substituted itself for the federal Defendants, converting state-law claims against Lucas, Cross, Ansari, and Verhiley into FTCA claims against the United States. The district court dismissed Plaintiffs' state-law and FTCA claims on the ground that there was

probable cause to arrest and prosecute Webb and Price. Because there are factual disputes as to the existence of probable cause, we reverse and remand the district court's grant of summary judgment on state-law claims with respect to the individual Defendants.

Price has conceded that his false-arrest and trespass FTCA claims against the United States are time barred, and so those claims were properly dismissed. The United States argues that Webb and Price waived their rights to object to the district court's grant of summary judgment on the remaining FTCA claims because they failed to raise any counterarguments before the district court. But the United States moved for, and the district court granted, summary judgment on the ground that probable cause foreclosed the Plaintiffs' state-law claims, and the Plaintiffs have continuously argued that there was no probable cause for their prosecutions. We therefore reverse and remand the remaining FTCA claims against the United States.

## C.  Reassignment to a New District Judge

Webb requests reassignment on remand to another judge. To determine whether reassignment is appropriate, we consider the following factors:

> (1) whether the original judge would reasonably be expected to have substantial difficulty in putting out of his or her mind previously expressed views or findings;
> (2) whether reassignment is advisable to preserve the appearance of justice; and
> (3) whether reassignment would entail waste and duplication out of proportion to any gain in preserving the appearance of fairness.

*U.S. ex rel. Williams v. Renal Care Grp., Inc.*, 696 F.3d 518, 532-33 (6th Cir. 2012) (citation omitted). Webb cites the first factor as militating in favor of reassignment because the district judge has "already repeatedly decided that this case has no merit." Webb's Br. at 72. "Reassignment is an extraordinary power and should be rarely invoked." *Williams*, 696 F.3d at 533 (internal quotation marks omitted). In *United States v. Bistline*, we granted the government's request for reassignment for sentencing only after the district judge stated, "[i]f I have got to send somebody like Mr. Bistline to prison, I'm sorry, someone else will have to do it. I'm not going to do it." 720 F.3d 631, 635 (6th Cir. 2013), *cert. denied,* 134 S. Ct. 1514 (2014). The district judge in this case has not unequivocally demonstrated such an unwillingness to entertain alternative viewpoints. Accordingly, we deny Webb's request for reassignment.

**IV.  Conclusion**

For reasons set forth above, we REVERSE the district court's decision that Price lacked standing.  We also REVERSE the grants of summary judgment to: Lucas and Metcalf with respect to Webb's malicious-prosecution claim; Lucas, Metcalf, and Faith with respect to Price's malicious-prosecution claim; Lucas with respect to Webb's false-arrest claim; Lucas, Metcalf, and Cross with respect to Webb's fabrication-of-evidence claim; Lucas, Metcalf, and Faith with respect to Price's fabrication-of-evidence claim; Lucas, Metcalf, and Cross with respect to Webb's *Bivens* and § 1983 conspiracy claims; and Lucas, Metcalf, and Faith with respect to Price's *Bivens* and § 1983 conspiracy claims.  With the exception of Price's trespass and false-arrest FCTA claims, we REVERSE and REMAND the Plaintiffs' state-law and FTCA claims and AFFIRM the remaining dismissals and grants of summary judgment.