**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 18a0001n.06

Case No. 16-2531

**FILED**
Jan 03, 2018
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| RICHARD KEVIN STEIGER, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE EASTERN DISTRICT OF |
| ROBERT HAHN; MICHAEL A. | ) | MICHIGAN |
| CALDWELL; PATRICK BOYD; DELMAR | ) | |
| PUTNAM; KEN MILLS, JR.; ALAN | ) | |
| BURKE; BRADLEY SZATKOWSKI; | ) | |
| JOSEPH BREWBAKER; ROBERT | ) | |
| PASCHKE, | ) | |
| | ) | |
| Defendants-Appellees. | ) | |

BEFORE: CLAY, COOK, and WHITE, Circuit Judges.

COOK, Circuit Judge. Michigan law enforcement officers investigated a tip regarding prescription pain-medication habits of then-Presque Isle County Prosecutor Richard Steiger that culminated in the Michigan Attorney General's Office ("AG's Office") charging him with one count of fraudulently obtaining controlled substances. Finding that probable cause supported charging and arresting Steiger and that qualified immunity shielded the officers, the district court granted summary judgment and dismissed all federal claims with prejudice. It also dismissed the remaining state-law claim without prejudice as better suited for resolution in state court. Steiger appeals and we AFFIRM.

**I.**

*Tip Leads to Prescription-Use Review*

In 2011, Steiger's ex-wife contacted Robert Hahn, a Michigan State Police detective working as part of the Huron Undercover Narcotics Team ("HUNT"), and alleged that Steiger was "doctor shopping" to obtain large quantities of controlled substances. Detective Hahn then began an investigation that started with requesting Steiger's prescription history from the Michigan Automated Prescription Services ("MAPS").

Detective Hahn evaluated the MAPS report and documented his findings in an incident report:

> The M.A.P.S. report revealed that in the year 2010, Steiger was issued a total of 1,840 units of Oxycodone/Oxycontine of varying milligram strengths and consistencies, as well as 2,075 units of Hydrocodone of varying milligram strengths and consistencies. In the year 2011, the amounts were 1,868 units of Oxycodone/Oxycontine and 650 units of Hydrocodone. Based upon the enormous amount of Hydrocodone and Oxycodone/Oxycontine being prescribed to Steiger in the last two years, it is unlikely that the prescribing physicians involved in Steiger's medical treatment are aware of one-another. Or, at the very least, are aware that the others are prescribing controlled substances to him in addition to that which they are prescribing.

Detective Hahn additionally flagged seven specific time frames during which Steiger acquired large numbers of prescription pain pills from separate doctors and filled these prescriptions at varying pharmacies.

Because Steiger served on HUNT's board of directors, HUNT transferred the investigation to a drug-enforcement team known as SANE from a different geographic jurisdiction.

*Michigan Attorney General Takes Role*

Detective Ken Mills, as lead investigator for SANE, sought advice from the AG's Office on approaching this investigation. He discussed the facts learned from Steiger's MAPS report with Assistant Attorney General ("AAG") Richard Cunningham, Chief of the Criminal Division. AAG Cunningham decided to have an expert review the MAPS report first. He requested a medical opinion from Dr. Kirk Mills at the Detroit Receiving Hospital, whose experience includes time in emergency medicine where "[p]art of [his] routine practice" involved reviewing MAPS reports to "evaluat[e] new patients requesting controlled substance pain medications." Dr. Mills also conducted similar reviews for malpractice cases, insurers, and for the DEA. AAG Cunningham wrote:

> Dear Dr. Mills:
>
> We are seeking your expert medical opinion on certain matters, in order to help this office make the legal determination as to whether there is probable cause to believe that a person's medical records will provide evidence that a crime has occurred. Our focus is on whether a suspect's medical records are likely to provide evidence regarding the crime of Fraudulently Obtaining a Prescription for a Controlled Substance from a Health Care Provider, in violation of MCL 333.7403a(1).
> . . . .
> Our working theory is that the amount of the controlled substances and frequency of the prescriptions indicate a questionable level of use, and may point to some type of abuse, dependency or addiction. But our focus is really on whether or not there was any fraud on the part of the patient in obtaining the substances.

Dr. Mills reviewed the MAPS report and opined that "[Steiger's] pattern of obtaining pain medication from two different physicians and using multiple pharmacies to get them filled [ ] is completely consistent with drug abuse, misuse, or diversion." He found Steiger's "pattern of obtaining medications earlier than predicted based on the quantity prescribed" to be "consistent with drug misuse, abuse, and/or diversion." Dr. Mills concluded that normally a "[l]egitimate

chronic pain patient[]" would be expected to disclose any unused pills and forgo additional prescriptions. Yet Steiger continued obtaining and filling excess prescriptions.

Having the benefit of this input, AAG Cunningham reported to Detective Mills that "in [the independent expert physician's] professional judgment the [MAPS] records clearly established that the subject, Richard Kevin Steiger, had fraudulently obtained controlled substances." AAG Cunningham authorized Detective Mills to apply for warrants to search Steiger's treating physicians' offices and the dispensing pharmacies.

Detective Mills set about investigating the two physicians that frequently prescribed medication to Steiger—his primary physician, Dr. Jeffrey Kiel, and a pain management doctor, Dr. Robert Coombs. Officers interviewed both physicians twice. Detective Hahn and HUNT Commander Delmar Putnam conducted Dr. Coombs's first interview, and Detective Mills conducted Dr. Kiel's first interview. Dr. Coombs pointed to a patient contract Steiger signed promising not to obtain controlled substances from other physicians, and Dr. Kiel reported that he did not know about all the medications Dr. Coombs prescribed, although he knew Steiger was also seeing Dr. Coombs.

The same day Detective Mills interviewed Dr. Kiel, he also interviewed Steiger about his prescription history. Steiger maintained that he disclosed to both doctors the existence of the other and that each knew that he needed prescriptions to control his chronic pain. A "mishandled nasal surgery" in 1993 left Steiger with "continuous pain and discomfort" and a "significant history of sinusitis and migraine headaches," which is undisputed.

With these interviews concluded, Detective Mills, HUNT Commander Putnam, Commander Michael Caldwell, the county sheriff, and the then-Presque Isle County assistant prosecutor met to discuss the investigation. At that meeting, Detective Mills told the gathered

group that he thought the case against Steiger seemed weak. So the investigation continued with follow-up interviews of Dr. Coombs and Dr. Kiel. Asked to focus again on Steiger's file, Dr. Coombs admitted that Steiger actually *had* disclosed that Dr. Kiel was also prescribing pain medication, but Dr. Coombs added that he did not know of the Percocet Dr. Kiel prescribed.

As for Dr. Kiel's second interview, when he looked again at the MAPS report of Steiger's prescription history, he took note of the quantity of pills both he and Dr. Coombs prescribed in a short time span. It showed Steiger received some 240 hydrocodone pills from Dr. Kiel's office on one date. Just 19 days later, he obtained an additional 180 pills from Dr. Coombs. Then, 16 days later, he acquired 155 pills from Dr. Coombs and another 240 from Dr. Kiel. The MAPS report reflected another 240 dispensed from Dr. Kiel less than a month later, and a week after that, an additional 240 pills from Dr. Kiel.

In the course of discussing this, Dr. Kiel offered that Steiger would often ask to refill prescriptions early. On the occasion when Dr. Kiel wrote an additional prescription for Steiger just one week after prescribing 240 pills, Dr. Kiel thought Steiger misrepresented himself by not disclosing that he recently filled another prescription.

*Michigan AG Decides Evidence Supports Charging Steiger*

After this round of interviews, AAG Cunningham and his staff met again with Detective Hahn, Detective Mills, and HUNT Commander Putnam to discuss the investigation. The upshot of the meeting was that AAG Cunningham "and his colleagues would discuss the investigation and determine whether charges would be filed against Steiger." Two days later, AAG Cunningham let Detective Mills know the decision. According to the Michigan AG's Office, the evidence supported charging Steiger with one count of obtaining prescription narcotics by fraud in violation of M.C.L. § 333.7403a(1). AAG Cunningham related that "Steiger would be

informed of this decision . . . and [then] provided an opportunity to turn himself in to . . . [Detective] Mills."

*State Court Dismisses Charge*

Mills applied the next day for an arrest warrant from the AG's Office and eventually Steiger surrendered to the state police.

After a two-day preliminary examination, the state court dismissed the charge against Steiger, finding insufficient evidence of fraud.

*Steiger Sues Investigating Officers*

His victory in state court spurred Steiger to sue the investigating officers under 42 U.S.C. § 1983, alleging unreasonable seizure, First Amendment retaliation, denial of due process, malicious prosecution, and gross negligence under state law. Determining that qualified immunity shielded the officers, the district court granted summary judgment and dismissed with prejudice all federal claims. It dismissed the gross negligence claim without prejudice as better suited to state court resolution.

**II.**

We "review[] de novo a grant of summary judgment, including one based on qualified immunity." *Santiago v. Ringle*, 734 F.3d 585, 589 (6th Cir. 2013).

In determining whether qualified immunity supports granting summary judgment, we examine (1) whether the facts taken in the light most favorable to Steiger show that the officers investigating him violated a federal right and (2) whether that right was clearly established when violated. *See Tolan v. Cotton*, 134 S. Ct. 1861, 1865–66 (2014); *Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (giving courts discretion as to which prong to examine first). If all reasonable officers would know the action was unconstitutional, with precedent making it clearly unlawful,

the right is clearly established. *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "The Fourth Amendment conditions warrants on probable cause and prohibits unreasonable seizures. A police officer violates those restrictions only when his deliberate or reckless falsehoods result in arrest and prosecution without probable cause." *Newman v. Twp. of Hamburg*, 773 F.3d 769, 771–72 (6th Cir. 2014). Qualified immunity shields from liability "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

### III.

*Fourth Amendment Claims*

Steiger alleges that these Michigan State Police officers violated his Fourth Amendment rights by investigating and arresting him without probable cause.

Probable cause to arrest exists if "facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person . . . in believing, in the circumstances shown, that the suspect has committed, is committing or is about to commit an offense." *Crockett v. Cumberland Coll.*, 316 F.3d 571, 580 (6th Cir. 2003) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). The officer must examine "the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence." *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000). We review this determination from "the perspective of a reasonable officer on the scene, rather than [one] with the 20/20 vision of hindsight." *Klein v. Long*, 275 F.3d 544, 550 (6th Cir. 2001) (quoting *Kostrzewa v. City of Troy*, 247 F.3d 633, 639 (6th Cir. 2001)).

A tip led law enforcement to Steiger's MAPS prescription report; the contents of that report reasonably sustained continuing prosecutorial interest. Steiger's MAPS report showed he

filled prescriptions from two doctors at various pharmacies for over 6,400 Schedule 2 pills in two years' time. From there, the officers proceeded in a methodical way to examine "the totality of the circumstances, recognizing both the inculpatory *and* exculpatory evidence." *Gardenhire*, 205 F.3d at 318. They interviewed the prescribing physicians, focusing on those physicians' suggestions of Steiger's misrepresentations. The investigators also noted some inconsistencies in the doctors' recollections regarding Steiger's disclosure of prescriptions. The investigators documented this and other aspects of their investigation at each step.

Advice from the Criminal Division Chief of the Michigan Attorney General's Office guided this investigation. An expert medical opinion on the appropriate inferences to be drawn from the MAPS report underpinned the AG's Office's decision to obtain search warrants and to interview key witnesses.

Crucially, it was the Attorney General's assessment of the gathered evidence that led to the decision to charge and arrest Steiger. Though Steiger sues the investigators here, AAG Cunningham—a non-defendant—made the call to charge and arrest.

Steiger argues that retaliation and dislike motivated some investigators. He attributes prejudice to Detective Hahn's designation of Steiger's ex-wife as a confidential informant, thereby withholding her identity from the AG's Office to enhance her credibility. He also sees importance in testimony that Detective Mills believed that the case for fraud seemed weak.

Obviously, Steiger's ex-wife's tip led law enforcement to the MAPS report. The objective reaction to the contents of that report moved the investigation, and any subjective factors Steiger points to lost all relevance. The challenges Steiger raises all concern issues ancillary to the evidence of whether he fraudulently obtained at least portions of the vast quantities of drugs in the MAPS report. Once the police detectives were on to Steiger's

prescription history, the rest of the investigation focused on the drug prescribers and any duplicity by Steiger in his obtaining those prescriptions from them. And pointing to Detective Mills's opinion on the weakness of the fraud evidence gets Steiger nowhere. No such expression of skepticism establishes incompetence or unlawfulness. Steiger's argument is that Detective Mills's holding this view ought to have halted further investigation by him. Yes, the record reflects that an investigating detective doubted that the charges would hold up. And as it turned out here, they did not. But Detective Mills investigated and reported the results to AAG Cunningham, and AAG Cunningham directed that Detective Mills pursue the arrest warrant. The sheer volume of prescription pain medication, the expert's opinion that the volume suggested further review, and the intervening assessment and decision by the AG's Office render Steiger's arguments tangential rather than pertinent.

These officers proceeded as directed by the Attorney General to investigate the case and to eventually process the warrant for Steiger's arrest. Given that the investigators followed the direction of the non-defendant State of Michigan, Steiger is left to argue that the investigators skewed the AG's assessment by withholding from the AG medical records gathered from the doctors' offices that would have shown Steiger's bona fides in getting all these prescription drugs. *See Yancey v. Carroll Cty.*, 876 F.2d 1238, 1243–44 (6th Cir. 1989) ("[A]n officer cannot rely on a judicial determination of probable cause if that officer knowingly makes false statements and omissions to the judge such that but for these falsities the judge would not have issued the warrant."); *see also Ahlers v. Schebil*, 188 F.3d 365, 373 (6th Cir. 1999). In fact, days passed between the time Detective Hahn forwarded those records and the AG's Office called Steiger to offer him the option to surrender. As the district court saw it, nothing supports Steiger's theory that the AG's Office had no opportunity to review the evidence that might have

exculpated him because five days intervened, permitting review. And what is more, not only is there no evidence of a decision to withhold the medical records, the record shows that Detective Mills's email to request the arrest warrant includes the express promise to send the medical records—a promise the record confirms he kept when Detective Hahn mailed the medical records.

Though evidence supporting fraud might have been murky due to ambiguity in the doctors' testimony, in the absence of evidence of deliberate or reckless falsehoods, these officers could rely on the AG's Office's independent judgment that probable cause existed to charge Steiger. *See Newman*, 773 F.3d at 771–72; *Ahlers,* 188 F.3d at 373 (finding that when an officer did not act with reckless disregard for the truth, the prosecutor's determination to seek an arrest warrant and a neutral magistrate judge issuing the warrant ratified his belief of probable cause).

Given that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law," we have no cause to disturb the district court's determination that these officers are immunized from trial and liability on Steiger's seizure and malicious prosecution claims. *See Malley*, 475 U.S. at 341 (1986).

*First Amendment Retaliation*

Steiger also alleges that his past complaints about the defendant officers' work and some personal entanglements he had with them led them to retaliate by wrongfully pursuing the fraud charge. Like the district court, we reject this claim on the basis that because the AG's Office made the determination that probable cause existed to charge Steiger, it is clear that the charge would have been brought "even without a retaliatory motive." *See Hartman v. Moore*, 547 U.S. 250, 260–62 (2006).

- 10 -

*Due Process*

Steiger argues a deprivation of individual liberty because "his good name was smeared by Defendants with a fraud charge that they knew was false." He also claims interference with familial relationships because his ex-wife acted as an informant, and the officers created "a situation in which Steiger's ex-wife and daughter would be called to testify at a preliminary hearing." Again, Steiger's argument hinges on the decision to charge, made by the AG. And he presents only general and conclusory propositions that raise no issue of material fact to move this court to reverse the grant of summary judgment.

*Supplemental Jurisdiction*

Steiger argues that because the district court incorrectly found none of his federal claims viable, it also incorrectly failed to exercise supplemental jurisdiction over his state law claim. Given our agreement with the district court's dismissal of Steiger's other claims, we assess its choice to dismiss the state claim without prejudice to be well within its discretion.

## IV.

We AFFIRM the district court's judgment.

**CLAY, Circuit Judge, dissenting.** This suit was commenced pursuant to 42 U.S.C. § 1983 based on Plaintiff Richard Steiger's allegations that Defendant law enforcement officers who investigated and arrested him for fraudulently obtaining prescription drugs proceeded in the absence of probable cause. The district court thereafter granted Defendants' motion for summary judgment and dismissed Plaintiff's federal claims with prejudice, holding that the existence of probable cause supported Defendants' actions and that because there were no genuine issues of material fact, Defendants were shielded from suit by qualified immunity. The majority accepts at face value the district court's conclusory ruling that probable cause existed for no other reason than that Plaintiff regularly obtained voluminous amounts of prescription drugs—ostensibly to treat his excruciating pain. Importantly, the majority refuses to consider the possibility that the physicians furnishing the prescriptions to Plaintiff were the ones at fault for over-prescribing opioid pain medication. The majority also fails to appropriately take account of the investigating officers' failure to adequately consider the possibility that the doctors involved might have been less than truthful in claiming that they did not know of the existence of other physicians furnishing prescriptions to Plaintiff—notwithstanding that some evidence to the contrary was provided by Plaintiff and the physicians themselves. The majority also contends that the ultimate decision to charge Plaintiff was not made primarily by Defendants, but by the Michigan Attorney General's Office—although the factual circumstances surrounding the decision to criminally charge Plaintiff also remain a matter of dispute.

I believe that the district court and the majority erred in finding that there was no genuine issue of material fact as to whether officers had probable cause to arrest Plaintiff, and erred in finding that the decision, purportedly by the Michigan Attorney General's office resulting in the

bringing of criminal charges, absolves the officers of all responsibility for their role in effectuating an improper arrest. I therefore respectfully dissent.

## A. Plaintiff Has Raised Genuine Issues of Material Fact as to the Existence of Probable Cause

Plaintiff brought claims against Defendant officers for violation of his Fourth Amendment rights, First Amendment retaliation, state law gross negligence, and violation of his Fourteenth Amendment due process rights. Each of his claims requires him to show that there was no probable cause for his arrest. *See, e.g.*, *Stemler v. City of Florence*, 126 F.3d 856, 871 (6th Cir. 1997) (false arrest claim under § 1983); *Voyticky v. Village of Timberlake*, 412 F.3d 669 (6th Cir. 2005) (false arrest, false imprisonment, and malicious prosecution claims under §1983); *Hartman v. Moore*, 547 U.S. 250, 266 (2006) (First Amendment retaliation). That is, if there was probable cause for Plaintiff's arrest, these claims are precluded.[1]

Probable cause to arrest a suspect exists if the "facts and circumstances within the officer's knowledge [ ] are sufficient to warrant a prudent person or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979). "[T]he facts known to the arresting officer at the time of the arrest" form the basis of the asserted probable cause. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The officer's conclusion that probable cause exists must be supported by "reasonably trustworthy information." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). And obtaining such "reasonably trustworthy information" means undertaking a

---

[1] Defendants were alleged to have a motive to pursue Plaintiff without probable cause: Plaintiff, in his role as Presque-Isle County prosecutor, had been critical of various members of the Huron Undercover Narcotics Team ("HUNT")—the team that initiated his investigation before it was turned over to the Straights Area Narcotics Enforcement ("SANE") unit. Specifically, Plaintiff had criticized the HUNT department and its officers for the "wrongful protection of an officer's family member from prosecution; witness intimidation; rogue interrogation tactics; handling of improper investigations; and public deception." (Brief for Appellant at 47–48.)

thorough investigation and pursuing exculpatory as well as inculpatory evidence. *Ahlers v. Schebil*, 188 F.3d 365, 371 (6th Cir. 2007). In the instant case, much of what passes for "evidence" against Plaintiff consists of self-interested statements by the prescribing physicians who failed to satisfactorily explain why they were willing to prescribe such large quantities of medication to Plaintiff (for which the doctors themselves might be culpable); and who sought to deny any knowledge that Plaintiff was obtaining prescriptions from other physicians, notwithstanding evidence to the contrary.

In this case, there is a genuine issue of material fact as to whether the "facts and circumstances" known to the officers at the time of Plaintiff's arrest would be "sufficient to lead an ordinarily prudent person to believe" that Plaintiff was guilty of fraudulently obtaining prescriptions. Indeed, the evidence against Plaintiff was extraordinarily slim.

The investigation into Plaintiff's drug activity began when, in September 2011, Detective Hahn was approached by Plaintiff's disgruntled ex-wife with medications she had taken from Plaintiff's apartment. She told Detective Hahn that she believed Plaintiff was "doctor shopping" and that he was using doctors Kiel and Coombs. Detective Hahn initially expressed skepticism: "But two doctors isn't—I mean, yes, there could—you could have a problem there, particularly if you are . . . playing them off of each other, but typically a good doctor shopping case would require at least three, four, maybe five, and that could be." (R. 43-5, Kirah Steiger Interview I, PageID 1237.) Nonetheless, Detective Hahn ran a Michigan Automated Prescription Service ("MAPS") report, and was surprised by the number of medications that Plaintiff had been prescribed for his chronic conditions, and thereafter sought guidance from the Michigan Attorney General's Office.

- 14 -

Assistant Attorney General Cunningham sent the MAPS report to Dr. Kirk C. Mills to review in order to determine whether the report was consistent with the officers' theory that Plaintiff was fraudulently obtaining medication. Dr. Mills reviewed the MAPS report and concluded that it was "consistent with drug use, misuse, or diversion." (R. 50-20, Mills Rep., PageID # 2405.) He also concluded that the MAPS report indicated that Plaintiff was doctor shopping based on the high volume of pills that both Dr. Kiel and Dr. Coombs seemed to overprescribe. (*Id.*) On September 26, 2011, the officers obtained search warrants for eleven medical facilities and pharmacies, including the medical offices of Dr. Robert Coombs and Dr. Jeffrey Kiel, the two doctors who had prescribed nearly all of Plaintiff's pain medication. (R. 50-22, Incident Report, at PageID # 2414.)

On October 25, 2011, detectives from the SANE unit interviewed Dr. Kiel, who said that he was surprised that Plaintiff was receiving so much medication from Dr. Coombs. (R. 50-3, Kiel Interview I, PageID # 2178–79.) Nevertheless, Dr. Kiel admitted that Plaintiff had told him that he was receiving OxyContin prescriptions from another doctor. (*Id.* at PageID # 2171.) That same day, detectives interviewed Dr. Coombs. Dr. Coombs said that he was unaware that Plaintiff was receiving pain medication from other doctors and that, if he were doing so, he was violating a contract that Dr. Coombs had all of his patients sign, in which they promised not to "attempt to obtain any controlled medicines . . . from any other doctor." (R. 50-5, Coombs Interview I, at PageID # 2196–2200.)

After these interviews, Detectives Mills, Putnam, and Caldwell from the Straights Area Narcotics Enforcement ("SANE") unit met with Presque Isle County Sheriff Paschke and Presque Isle County Assistant Prosecutor, Meghan Hurley, to discuss the investigation. (R. 50-6, Hurley Aff., at PageID # 2229.) Detective Mills indicated to the group that he thought the case

against Plaintiff was weak. (*Id.* at PageID # 2229–30.) And according to Hurley, she left the meeting with the impression that Plaintiff would not be charged. (*Id.* at PageID # 2230.)

Undeterred, Detective Hahn again interviewed Dr. Coombs on October 31, 2011. (R. 50-7, Coombs Interview II, PageID # 2231–55.) The two reviewed Plaintiff's medical records, which revealed that Plaintiff had indeed disclosed to Dr. Coombs at least some of the medication he was receiving from other sources. (*Id.* at PageID # 2233–34.)

On November 14, 2011, Detective Mills interviewed Physician's Assistant Jeffrey Kwiatkowski, who had prescribed twenty Percocet pills to Plaintiff during an emergency room visit in September 2011. (R. 43-20, Kwiatkowski Interview, PageID # 1391–98.) Kwiatkowski said that Plaintiff told him that he was receiving pain medication from other doctors, and that the additional pain medication that Kwiatkowski prescribed was legitimate, given Plaintiff's chronic sinus issues and his recent gluteal abscess surgery. (*Id.* at PageID # 1394–97.)

That same day, Detective Mills also interviewed Dr. Kiel for a second time. (R. 43-21, Kiel Interview II, PageID # 1399–1423.) Dr. Kiel told Mills that Plaintiff must have misrepresented himself because "there is no way [Dr. Kiel] would have given" additional medication so soon after Plaintiff received similar medication from Dr. Coombs. (*Id.* at PageID # 1403.) Dr. Kiel also asserted that, even though Plaintiff had disclosed that he was getting prescriptions from another doctor, Plaintiff was nonetheless "being deceptive" in getting pain medications from both doctors Kiel and Coombs. (*Id.* at PageID # 1413–14.) Dr. Kiel highlighted what he regarded to be a particularly egregious deception: namely, Plaintiff told Kiel that Dr. Coombs had authorized Kiel to prescribe pain medication for Plaintiff's migraines; Dr. Kiel never confirmed this with Dr. Coombs. (*Id.* at PageID # 1416.) Dr. Kiel told police that

he made a mistake by not independently confirming Plaintiff's prescriptions and treatment plan with Dr. Coombs. (*Id.* at PageID # 1422.)

To briefly summarize, the evidence that officers had against Plaintiff at the time the decision was made to arrest him was as follows: a largely unsupported accusation by Plaintiff's disgruntled ex-wife; a MAPS report that showed only that Plaintiff had obtained a large amount of prescription medication; an interpretation of that report that concluded little more than that Plaintiff might have a drug problem; and interviews with multiple doctors who stated, in essence, that they were shocked to find that Plaintiff was receiving so much medication, notwithstanding the fact that a brief review of the doctors' medical files showed that Plaintiff had in fact informed the doctors about each other's prescriptions, casting serious doubts on the integrity of their self-serving statements. That's it. Unsurprisingly, Daryl Vizina, the elected prosecutor for Cheboygan County, said that after the decision to charge Plaintiff was made, Detective Mills told him that he was surprised the charges had been brought because it was "not a great case." (R. 50-11, Vizina Aff., at PageID # 2265.)

On January 24, 2012 and February 2, 2012, the state's 88th District Court conducted a preliminary examination. Judge Theodore Johnson concluded that although Plaintiff had obtained a tremendous amount of pills, he was not charged with prescription drug abuse, but with fraudulently obtaining prescriptions, and the evidence did not show that Plaintiff made misrepresentations to his physicians. (R. 50-2, Prelim. Ex. Trans. at PageID # 2157–60.) Instead, every time he had an appointment with Dr. Coombs, he filled out a form indicating that he was receiving medication from another doctor. (*Id.* at PageID # 2158.) Similarly, the evidence showed that Dr. Kiel knew that Dr. Coombs was prescribing pain medication. (*Id.* at 2158–60.) Accordingly, the court found that the government had not shown probable cause of

- 17 -

fraud sufficient to bind the case over for trial. (*Id.* at PageID # 2160.) This decision was affirmed on appeal to the Alpena County Circuit Court. (R. 50-13, Circuit Court Order, PageID # 2269–76.)

The foregoing review of the evidence demonstrates just how weak the case against Plaintiff was. The majority's mischaracterization of the evidence in order to argue the existence of probable cause is entirely misplaced when one considers that "courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (citing *Brosseau v.* Haugen, 543 U.S. 194, 195 n.2 (2004)). In light of the fact that all reasonable inferences must be given to Plaintiff at the summary judgment stage, the district court obviously erred in holding that Plaintiff would be unable to prove the requisite lack of probable cause to succeed on his federal claims.

Nonetheless, the district court and the majority both argue that the final decision to prosecute Plaintiff purportedly was not made by the police officers, but by AAG Cunningham, who is not a defendant in this case. (R. 43-5, MSP Incident Report, PageID # 1224.) But even if their contention in that regard could be substantiated, a police officer cannot absolve himself of his misconduct through an independent probable cause determination of a prosecutor. *See Yancey v. Carroll Cty.*, 876 F.2d 1238, 1243–44 (6th Cir. 1989); *Awabdy v. City of Adelanto*, 368 F.3d 1062, 1067 (9th Cir. 2004) (holding that the "presumption of prosecutorial independence does not bar a subsequent § 1983 claim against state or local officials who improperly exerted pressure on the prosecutor, knowingly provided misinformation to him, concealed exculpatory evidence, or otherwise engaged in wrongful or bad faith conduct that was actively instrumental in causing the initiation of legal proceedings"); *cf. Malley v. Briggs*, 475 U.S. 335, 340–45 (1986) (affirming lower court's holding that "an officer who seeks an arrest warrant by

submitting a complaint and supporting affidavit to a judge is not entitled to immunity unless the officer has an objectively reasonable basis for believing that the facts alleged in his affidavit are sufficient to establish probable cause"); *Moldowan v. City of Warren*, 578 F.3d 351, 379 (6th Cir. 2009) ("Although the prosecutor undoubtedly plays a 'special role' in 'the search for truth in criminal trials,' . . . the police also play a unique and significant role in that process, and thus also are bound by the government's constitutional obligation to 'ensure that a miscarriage of justice does not occur.'"). Indeed, to make out a malicious prosecution claim, an officer need not have made the final decision to prosecute—all that is required is that an officer must have "participated" in the decision. *Webb v. U.S.*, 789 F.3d 647, 659 (6th Cir. 2015). And "the term 'participated' should be construed within the context of tort causation principles. Its meaning is akin to 'aided.' To be liable for 'participating' in the decision to prosecute, the officer must participate in a way that aids in the decision, as opposed to passively or neutrally participating." *Id.* at 660 (quoting *Sykes v. Anderson*, 625 F.3d 294, 308 (6th Cir. 2010)). In the instant case, these are all issues that should be left to the determination of the trier of fact.

Moreover, what the Michigan Attorney General decided is either irrelevant or is only evidentiary in nature as to the factual issue of the existence of probable cause and is, therefore, inappropriate for resolution at summary judgment. The question for the Court is whether there is a genuine issue of material fact as to whether Defendants had probable cause to arrest Plaintiff. "In general, the existence of probable cause in a § 1983 action presents a jury question, unless there is only one reasonable determination possible." *Fridley v. Horrighs*, 291 F.3d 867, 872 (6th Cir. 2002) (quotation marks omitted). That the Michigan Attorney General also erred does not point to only one reasonable determination of responsibility for the improper charging decision or otherwise inoculate the officers' own errors.

**B. Plaintiff Has Shown the Existence of Material Factual Disputes as to Whether Defendants Knowingly or Recklessly Set His Prosecution in Motion Despite the Absence of Probable Cause**

In light of the preceding discussion that a genuine issue of material fact exists as to whether officers had probable cause to arrest Plaintiff, the district court erred by prematurely dismissing each of Plaintiff's federal claims rather than submitting them to the trier of fact.

**1. Fourth Amendment Claims**

"The Fourth Amendment protects the right of individuals to be free from improper arrest and detention." *Logsdon v. Hain*, 492 F.3d 334, 340 (6th Cir. 2007) (citing U.S. Const. amend. IV ("The right of the people to be secure in their persons . . . against unreasonable seizures . . . shall not be violated.")). This Court recognizes a "'constitutionally cognizable claim of malicious prosecution under the Fourth Amendment,'" which encompasses "wrongful investigation, prosecution, conviction, and incarceration." *Barnes v. Wright*, 449 F.3d 709, 715–16 (6th Cir. 2006) (quoting *Thacker v. City of Columbus*, 328 F.3d 244, 259 (6th Cir. 2003)). "The 'tort of malicious prosecution' is 'entirely distinct' from that of false arrest, as the malicious-prosecution tort 'remedies detention accompanied not by absence of legal process, but by *wrongful institution* of legal process.'" *Sykes*, 625 F.3d at 308 (quoting *Wallace v. Kato*, 549 U.S. 384, 390 (2007)) (emphasis in original). "In order to distinguish appropriately this claim from one of false arrest, we must consider not only whether the Defendants had probable cause to arrest the Plaintiffs but also whether probable cause existed to initiate the criminal proceedings against the Plaintiffs." *Id.* at 310–11 (citing *Fox v. DeSoto*, 489 F.3d 227, 237 (6th Cir. 2007); and citing *Barnes*, 449 F.3d at 716).

The elements of a malicious prosecution claim under § 1983 when the claim is premised

on a violation of the Fourth Amendment are as follows:

> First, the plaintiff must show that a criminal prosecution was initiated against the plaintiff and that the defendant made, influenced, or participated in the decision to prosecute. Second, because a § 1983 claim is premised on the violation of a constitutional right, the plaintiff must show that there was a lack of probable cause for the criminal prosecution. Third, the plaintiff must show that, as a consequence of a legal proceeding, the plaintiff suffered a deprivation of liberty … apart from the initial seizure. Fourth, the criminal proceeding must have been resolved in the plaintiff's favor.

*Id.* at 308–09 (internal quotation marks, citations, and alterations omitted).

The district court granted summary judgment for Defendants on this claim because it held

that "Steiger cannot show that probable cause was so clearly missing as to make the investigation

unreasonable." (R. 55, Order, at PageID # 2492.) Because the record below clearly shows that

there is a genuine issue of fact as to whether the officers had probable cause to arrest Plaintiff (as

well as whether the Attorney General had probable cause to charge him), I would reverse the

district court's grant of summary judgment on this claim.

## 2. First Amendment Retaliation

As for Plaintiff's First Amendment retaliation claim, the Supreme Court has recognized

that the official conduct of police officers is a matter of fundamental importance to the operation

of free government, noting that "[t]he freedom of individuals verbally to oppose or challenge

police action without thereby risking arrest is one of the principal characteristics by which we

distinguish a free nation from a police state." *City of Houston v. Hill*, 482 U.S. 451, 462–63

(1987). This Court has said that "[o]bviously, the public is concerned with how a police

department is operated and efforts to give public exposure to alleged misconduct are protected."

*McMurphy v. City of Flushing*, 802 F.2d 191, 196 (6th Cir. 1989). Plaintiff argues that when he

criticized members of the HUNT team, especially Detectives Hahn and Caldwell, he was speaking out on a matter of public concern. (Brief for Appellant at 47.) Specifically, Plaintiff criticized the department and its officers for the "wrongful protection of an officer's family member from prosecution; witness intimidation; rogue interrogation tactics; handling of improper investigations; and public deception." (Brief for Appellant at 47–48.)

To establish a claim for First Amendment retaliation, "a plaintiff must show that (1) he was participating in a constitutionally protected activity; (2) defendant's action injured plaintiff in a way 'likely [to] chill a person of ordinary firmness from' further participation in that activity; and (3) in part, plaintiff's constitutionally protected activity motivated defendant's adverse action." *Ctr. for Bio-Ethical Reform, Inc. v. City of Springboro*, 477 F.3d 807, 821 (6th Cir. 2007) (quoting *Bloch v. Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)). "Once a plaintiff raises an inference that the defendant's conduct was motivated in part by plaintiff's protected activity, the burden shifts and defendant 'can demonstrate that it would have taken the same action in the absence of the protected activity.'" *Id.* (quoting *Arnett v. Myers*, 281 F.3d 552, 560–61 (6th Cir. 2002)). An "action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway." *Hartmann*, 547 U.S. at 260. The plaintiff must show that the defendant "induced the prosecutor to bring charges that would not have been initiated without his urging." *Id.* at 262. The Supreme Court has interpreted this requirement to mean that lack of probable cause must be "pleaded and proven" in order for a plaintiff to prevail on a First Amendment retaliatory prosecution claim under § 1983. *Id.* at 266; *Barnes*, 449 F.3d at 719.

The district court concluded that Plaintiff's claim failed because the officers had probable cause to arrest him. (R. 55, Order, PageID # 2494.) But because there exist genuine issues of

fact as to whether the officers had probable cause to arrest Plaintiff, I would reverse the district court's grant of summary judgment on this claim as well.

### 3. Due Process

Finally, Plaintiff argues that Defendant's actions constitute a violation of substantive due process. Substantive due process protects a narrow set of interests, including interests "protected by specific constitutional guarantees, . . . freedom from government actions that 'shock the conscience' and certain interests that the Supreme Court has found so rooted in the traditions and conscience of our people as to be fundamental." *Bell v. Ohio State Univ.*, 351 F.3d 240, 250 (6th Cir. 2003) (citing *Braley v. Pontiac*, 906 F.2d 220, 224–25 (6th Cir. 1990)). The district court held that "the initiation of prosecution in this instance was not so arbitrary and capricious as to shock the conscience" because "a reasonable police officer could have found that probable cause existed to charge Steiger with the crime". (R. 55, Summary Judgment Order, PageID # 2495.) This conclusory statement by the district court is at variance with the evidence and ignores the likelihood that the factfinder, on this record, could certainly find that a reasonable police officer would not have found the existence of probable cause.

I believe that genuine issues of fact as to probable cause precludes the granting of summary judgment on this count as well.

### CONCLUSION

Nobody disputes that Plaintiff obtained a voluminous amount of pills, but similarly, nobody disputes that Plaintiff was in a tremendous amount of pain. The record contains sufficient evidence to cast Plaintiff's doctors as characters in what has become an all-too-familiar story: the extreme over-prescription of pain medication. What the record does not show, however, is any convincing evidence that Plaintiff defrauded or otherwise misled his doctors.

Because there are genuine of issues of fact as to whether reasonable police officers—who should be very familiar with the phenomenon of over-prescription of pain medication that contributes to society's modern day opioid crisis—should have found that there was probable cause to arrest Plaintiff for fraudulently obtaining prescriptions, I respectfully dissent.